WOOD ET AL. *v.* ABELL, Administrator of the Estate
of Francis E. Abell ET AL.

[No. 155, September Term, 1972.]

*Decided February 13, 1973.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Edward J. Gorman, Jr.,* for appellant Glen Wood, Jr. *E. Gwinn Miller,* with whom were *Donahue & Ehrmantraut, James A. Kenney, III, Helga L. Kirst* and *Briscoe & Kenney* on the brief, for appellant St. Mary's County Fair Association, Inc.

*Fred R. Joseph,* with whom were *Karl G. Feissner, William L. Kaplan, Thomas P. Smith, Andrew E. Greenwald* and *Walter E. Laake, Jr.,* on the brief, for appellees.

LEVINE, J., delivered the opinion of the Court.

These appeals are from judgments entered upon a jury verdict in the Circuit Court for Calvert County (Bowen,

J.) in favor of appellees (plaintiffs below) against appellants (defendants below). Appellees' claims are the result of a tragic accident which occurred on the site of the annual St. Mary's County fair at Leonardtown on July 31, 1970. As a consequence of injuries suffered by Francis E. Abell (Francis) when he was run over by a tractor at that time and location, he died on August 8, 1970. The accident took place while Francis and his brother, Donald, were digging postholes, and a tractor owned and operated by appellee, Glen L. Wood (Wood), suddenly backed up and struck Francis, who was standing to its rear.

The Abells had been engaged as laborers by Wood, who was then vice president and general manager of the St. Mary's County Fair Association, Inc. (the Association). Wood hired them pursuant to authority granted several days before the accident by the Association's board of directors, which had decided that the fairgrounds could not be readied for the forthcoming annual event solely with volunteer labor. The Abells were to be paid by the hour and were to supply their own tools. For the most part, they were expected to perform various odd jobs involving minor carpentry as well as cleaning and repairing wherever directed by board members. No definite understanding was reached concerning the duration of their employment, but it was generally expected that their services would be needed for approximately one or two weeks. Clearly, no decision was reached that the Abells would be employed in the future or that the jobs would be continuous.

Wood, like all board members, furnished his services and sometimes his equipment as a volunteer; he was otherwise employed as an airline pilot. He seems to have had the responsibility for supervising the entire fair operation. His position, however, as vice president and general manager of the Association was not quite as auspicious as the title might suggest. In addition to performing the duties usually associated with that office, he ap-

pears to have been involved in seeing to it—partly by his own physical labor—that the facilities of the fair were prepared for the annual four-day event.

On the morning of July 31, 1970, the first day on which the Abell brothers were to report for duty, they appeared and initially assisted Wood in putting up some fence posts and then tearing down an old riding ring. The latter was to be replaced by a new ring which they were to begin erecting in the afternoon.

After lunch they began construction on the new ring, the first stage of which involved the digging of new postholes ten feet apart. The plan was to position Wood's tractor at a spot marked for each post and then use an auger to dig the hole. While they were digging the first hole, the auger went down a short distance and stopped, presumably because it had struck an abandoned piece of old post or some hardpan. Wood, who was seated on the tractor, shouted to the Abells to push down on the auger; they did so, but without any result. With that, Wood dismounted to help them push on the auger. Just as he was about to jump from the tractor, it started backwards and, being caught off-balance, he was thrown to the ground. He tried to stop the tractor, but before he could do so, it ran over Francis who had been standing to the left rear. Donald, who had also been in the tractor's path on the right side, was able to leap aside in time to avoid being struck.

As a result of the injuries thereby sustained, Francis died several days later, and actions were brought against the Association and Wood for wrongful death by his widow, Margaret, and his children, all of whom were adults; and by the administrator of his estate for conscious pain and suffering and funeral expenses. A motion for directed verdict aimed at the children's claims was granted. The jury awarded the widow $20,000 and the administrator $15,000, against both defendants.

From those judgments, appellants have taken this appeal in which they raise the following points:

(1) That the trial judge erred in determining that Francis was a "casual" employee within the meaning of Maryland workmen's compensation law.

(2) That the court erred in ruling that Wood was acting within the scope of his employment as an employee of the Association.

(3) That the trial judge, having made a pretrial determination that the Association was entitled to assert the defense of charitable immunity except to the extent it carried any liability insurance, erred in entering judgment before making a determination of insurance coverage "without explanation or clarification regarding the extent of the . . . Association's liability for such judgment."

(4) That the court erred in denying Wood's motions for directed verdict made at the end of the plaintiffs' case and at the conclusion of the entire case.

(5) That the court erred in its instructions on negligence and in reinstructing the jury on certain phases of negligence law.

(6) That the court erred in refusing to submit the issue of contributory negligence to the jury.

(7) That the court should have instructed the jury on the "fellow-servant" rule.

In addition to the points listed above, raised by either Wood or the Association, or both, an additional issue is presented in a cross-appeal taken by appellees. As we have noted, the trial judge made a pretrial determination that the Association was entitled to assert the defense of charitable immunity "to the extent it is not covered by liability insurance." Although Wood did not file a "motion raising preliminary objection," as the Association did, and as required by Rule 323b, on the day of trial he moved to amend his original plea which asserted only the general issue, so as to claim the defense of charitable immunity. The trial commenced without any ruling on the motion to amend, but at the end of the plaintiffs' case, the trial judge extended his earlier determination

of the Association's charitable immunity to Wood. That ruling is challenged by the cross-appeal.

(1)

Both appellants join in the contention that the trial judge erred in ruling as a matter of law that Francis was a "casual employee," and thus that appellees could maintain a "third-party" action instead of being confined to benefits under the workmen's compensation laws. It is recognized by all parties that if Francis was an "employee" within the meaning of workmen's compensation law, the actions brought by appellees could not have been prosecuted. Maryland Code (1957, 1964 Repl. Vol.) Art. 101, § 67 provides in relevant part that it "shall not apply to . . . casual employees . . . ."

The term "casual employee" has been considered in a number of Maryland cases as well as in many decided elsewhere. In dealing with it here, we cannot remain entirely oblivious to the fact that virtually all the reported decisions on this point we have examined rose out of workmen's compensation claims, in which a finding of "regular employment" was essential to recovery. Nor is the quest for a simple definition of the term "casual" aided by the fundamental principle that the Workmen's Compensation Act is to be construed as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes, *Bayshore Industries v. Ziats*, 232 Md. 167, 192 A. 2d 487 (1963); *Bethlehem-Sparrows Point Shipyard v. Hempfield*, 206 Md. 589, 112 A. 2d 488 (1955); *Watson v. Grimm*, 200 Md. 461, 90 A. 2d 180 (1952); *Board of Co. Comm'rs v. Fleming*, 13 Md. App. 261, 282 A. 2d 512 (1971). That this explanation for the elusiveness of a definition occurred to our predecessors is evident from the apt statement by Judge W. Mitchell Digges, for the Court, in *Hygeia Ice & Coal Co. v. Schaeffer*, 152 Md. 231, 238, 136 A. 548 (1927):

> "An examination of the many cases on this subject discloses that not infrequently the conclu-

sion of the court can be traced to its attitude towards workmen's compensation legislation, this attitude being an important factor in determining whether the particular court will construe the legislation under consideration liberally to effectuate its purpose, or will give such a strict construction as will tend to limit the scope of its operation. In this state the act itself requires that the courts construe its provisions liberally, and the decisions of this Court give force to this legislative mandate. Any definition must be a limitation, and therefore courts generally, either by reason of legislative mandate, or their view of the wisdom of the policy of such legislation, have refrained from giving a definition of the term 'casual employee' which must govern in all cases, but have preferred to leave the decision of any case to be governed by its *peculiar facts and circumstances*." (emphasis added)

One may therefore readily understand why this Court has consistently held that, in the absence of a statutory definition, application of the term, "casual employee," should be made according to the particular facts presented in each case, *Clayburn v. Soueid, Inc.,* 239 Md. 331, 211 A. 2d 728 (1965) ; *Hygeia Ice & Coal Co. v. Schaeffer, supra; State Accident Fund v. Jacobs,* 134 Md. 133, 106 A. 255 (1919) ; *Yelton v. Higgins,* 13 Md. App. 599, 284 A. 2d 857 (1971). The application of this rule has led us to observe that the term "casual" as used in the Workmen's Compensation Act, "is a word of indefinitely varied import." *Clayburn v. Soueid, Inc., supra; Moore v. Clarke,* 171 Md. 39, 187 A. 887 (1936).

In urging that the trial court erred in its ruling that Francis was a "casual employee," appellants rely heavily on *Hygeia* and *State Accident Fund v. Jacobs,* both *supra,* which they cite for the principle that:

"The question whether an employment is casual must be determined with principal reference to the scope and purpose of the hiring rather than with sole regard to the duration and regularity of the service." 134 Md. at 135.

In *Moore v. Clarke, supra,* this Court, addressing itself to what we have just quoted, said:

"[T]here are *criteria* which, by what seems to be the weight of authority, have been given weight in determining whether a given employment is casual or regular, such as the nature of the work (*[Hygeia Ice & Coal Co. v. Schaeffer* and *State Accident Fund v. Jacobs,* both *supra]* ), the duration of the employment, whether it is occasional, incidental, accidental, or a usual concomitant of the employer's business. . . . In the two cases last cited it was held, however, that in dealing with the question greater weight was to be given to the nature of the employment than to the infrequency or duration thereof, but in those cases the court was dealing with employment which in the one case extended over a canning season, and in the other for an indefinite period which might terminate in a few days or might continue for several weeks. In 33 A.L.R. 1463, the annotator, after examining the cases in a number of states, reaches the conclusion that 'No accurate statement can be made as to whether an employment for one job or a single piece of work is to be regarded as casual employment or not. The determination of this point may be governed by the length of time contemplated, or by the nature of the contract of employment; the great majority of the cases, however, hold that such an employment, which is to last but a short time, not more than three or four days or a week, and is for a limited and temporary pur-

pose, is casual.' In *Marvil v. Elliott*, 164 Md. 659, 665, 165 A. 822, 824, while emphasizing the importance of the nature of the work as reflecting upon the casual character of the employment, the court nevertheless stressed also the duration of the employment as a factor to be considered." 171 Md. at 53 (emphasis in original).

In *Clayburn v. Soueid, Inc., supra,* we quoted and applied the criteria articulated in *Moore.*

What has emerged from our prior decisions, therefore, is an elastic test for determining whether an employee is "casual" or "regular," and the nature of the employer's work and the scope and purpose of the hiring are merely included among the factors to be considered. But it is equally clear from the prior cases that duration of employment is at least as important in reaching the ultimate solution. The weight given to duration of employment is best illustrated perhaps by our decision in *Lupton v. McDonald*, 241 Md. 446, 217 A. 2d 262 (1966), where Judge Oppenheimer, speaking for the Court, said:

"The present case presents a converse factual situation to *Clayburn* and *Jacobs*. It is far closer to *East v. Skelly*, 207 Md. 537, 114 A. 2d 822 (1955), *Moore v. Clarke*, [*supra*], and *Marvil v. Elliott* [*supra*], in each of which the employee was engaged to perform a single service on a particular occasion only. In each case, we held, as a matter of law, that the employment was casual. In *Moore,* we said the employment 'was single, isolated, complete in itself, was connected with no past or future employment, and when it was finished all contractual relations between the employer and the employee ceased.' 171 Md. at 54. In *Marvil,* we pointed out that the brief service the employee was undertaking for the contractor 'had no relation to any en-

gagement between them in the past or future.' 164 Md. at 665. In the factual situation here presented, *East, Moore* and *Marvil* are controlling." 241 Md. at 450-51.

Support for Judge Bowen's conclusion that Francis was a "casual employee" is found in this excerpt from Wood's testimony:

"Q. And these were odd jobs that had to be done? A. Yes.

"Q. And this was pretty much a last minute decision, was it not, to have them around in case any work had to be done? A. Well, we knew we had maybe a week's work to be done. . . .

"Q. There was no definite decision as to how long they would be employed, was there? A. No.

"Q. And there was no definite decision as to whether they would be employed in the future there, was there? A. No.

"Q. And was there any definite decision as to how long at all they would be employed? A. None at all. In fact, they wouldn't have been employed unless some Board member went down and told them, here's this particular job, and that particular job, and went and bought the material and brought it up, and what have you.

"Q. They were like on call, or something like this? A. Yes, you might say that. They weren't doing anything at that particular time, if I remember correctly. . . ."

Appellants are not helped by their heavy reliance on Larson, *The Law of Workmen's Compensation,* § 51.23, from which they quote the following statement:

"Behind all these decisions lies one simple thought: Maintenance, repair, painting, clean-

ing, and the like are 'in the course' of business because the business could not be carried on without them, and because they are an expectable, routine, and inherent part of carrying on any enterprise. One cannot carry on a store business with the roof leaking and spoiling the goods on the counter. One cannot carry on a restaurant business with walls that will violate sanitary codes if allowed to become too dirty. One cannot operate a bus line without repairing the bus, or even without repairing the building in which one repairs the bus. On this general reasoning, then, the great majority of decisions have denied exemption under either type of statute for painting, window washing, repair work, maintenance, remodeling, incidental construction, clearing of land, and even moving a plant."

It is apparent that appellants have overlooked the context in which the above-quoted statement appears. A complete reading of § 51 reveals that the statutory exclusion of "casual employees" found in Maryland's Workmen's Compensation Law is unlike that in most other states. In fact, § 51.12 indicates that where the statute merely states "casual employment," "the courts have laid the principal stress on the irregular, unpredictable, sporadic, and brief nature of the work."

The point missed by appellants is that the exemption found in many state statutes provides, in addition to the employment being casual, that it also be outside the usual business of the employer. It is within the framework of such language that the statement which appellants have quoted is made, i.e., that "[m]aintenance, repair, painting, clearing, and the like are 'in the course' of business. . . ." *Id.* at § 51.23.

As a subsidiary contention, appellants urge that the question whether Francis was a "casual employee"

"should have at least been decided by the jury." We do not agree. Virtually the entire testimony on this issue came from witnesses connected with the Association, principally Wood. The determinative facts were undisputed here, and where this is so, we have held, as a matter of law, on the facts in the particular case, that employment was casual, *Lupton v. McDonald; East v. Skelly; Moore v. Clarke; Marvil v. Elliott,* all *supra. Cf. Clayburn v. Soueid, supra.* In the "peculiar facts and circumstances" presented here, Judge Bowen was correct in ruling, as a matter of law, that Francis was a "casual employee."

### (2)

Contending the trial court erred in ruling as a matter of law that Wood had acted within the scope of his employment, the Association claims the evidence permitted an inference that the replacement of the posts for the riding ring with the use of the tractor "was in no way connected with his duties as a member of the Board of Directors and General Manager." This argument, unsupported by citation of authority, is seemingly bottomed on two facts which are clearly undisputed: (1) That Wood's services on the day of the accident "were in the nature of voluntary services;" and (2) that he was operating his own tractor at no expense to the Association. We find no merit in this contention.

Neither the fact that Wood was working as a volunteer, *see* Restatement (Second) *Agency* § 225 (1958) and Seavey, *Law of Agency,* § 84; nor that the tractor belonged to him, *Regal Laundry v. A. S. Abell Co.,* 163 Md. 525, 163 A. 845 (1933) ; *Goldsmith v. Chesebrough,* 138 Md. 1, 113 A. 285 (1921) ; *see A. & P. Co. v. Noppenberger,* 171 Md. 378, 189 A. 434 (1937), insulates the Association from liability if, in any event, Wood was acting within the scope of his employment. As Judge Digges aptly said for the Court in *Drug Fair v. Smith,* 263 Md. 341, 283 A. 2d 392 (1971), quoting with approval from *Lewis v. Accelerated Express,* 219 Md. 252,

255, 148 A. 2d 783 (1959) and *Hopkins C. Co. v. Read Drug & C. Co.*, 124 Md. 210, 214, 92 A. 478 (1914):

> " 'The simple test is whether they were acts within the scope of his employment; not whether they were done while prosecuting the master's business, but whether they were done by the servant in *furtherance thereof, and were such as may fairly be said to be authorized by him.*' "
> 263 Md. at 350 (emphasis in original).

Wood testified that the board of directors shouldered the responsibility for the overall maintenance and operation of the fairgrounds; that, as vice president and general manager, he was a member of every committee; and that it was customary for members of the building committee to erect structures. One of the other directors, Mr. Cusic, testified as follows:

> "Q. Now what were the scope of duties as General Manager? A. Well, General Manager of a Fair is a job, that just about takes in any activity that goes on at the Fair, such as maintenance, grounds, buildings, anything in that capacity.
> "Q. And you mentioned maintenance and grounds, what do you mean in that regard? A. It is set up with different committees and the Vice President usually works in any of these with any of the committees that I mentioned.
> * * *
> "Q. Do you know the duties of the General Manager of the St. Mary's County Fair? A. To my knowledge, the General Manager usually takes care of heading up most of the work that is to be done around the Fair Grounds, such as buildings, grounds, etc.
> "Q. Who does most of the work around the grounds? A. Most of the work is done by the Directors.

"Q. Are there other people besides the Directors and Officers of the Fair Association who do this work? A. Sometimes, yes, Volunteers."

He also testified that it was not unusual for a director to supply a tractor and other equipment for work on the grounds, and that this was customarily done on a voluntary basis. This evidence amply supported a conclusion that Wood's activities at the time of the accident were in furtherance of the Association's business, "and were such as may fairly be said to be authorized by" it, *Drug Fair v. Smith, supra.*

Furthermore, this evidence was free of dispute. Whether a servant is acting within the scope of his employment is ordinarily a question for the jury, but this is so only if there is a factual dispute, *Drug Fair v. Smith; Lewis v. Accelerated Express,* both *supra; Greer Lines Co. v. Roberts,* 216 Md. 69, 80, 139 A. 2d 235 (1958). Hence, Judge Bowen was correct in instructing the jury as a matter of law that the Association was liable for Wood's negligence.

### (3)

Upon being served with the declaration, the Association filed a "Motion Raising Preliminary Objection" whereby, in effect, it asserted that it was entitled to the defense of charitable immunity, and also that the claims were not covered by insurance. Later, the Association moved to amend its motion by filing copies of its purported insurance policy and a letter from the insurer disclaiming coverage on the basis of a policy exclusion for "bodily injury to any employee of the insured arising out of and in the course of his employment by the insured."

Thus, by its motion the Association contended there was no coverage at all, and that the waiver of charitable immunity contained in Code (1957, 1972 Repl. Vol.) Art. 48A, § 480 is inapplicable. The defense of charitable immunity was premised on its corporate purpose as a fair

association and the applicability of *Md. State Fair v. Supervisor,* 225 Md. 574, 172 A. 2d 132 (1961).

The motion was heard prior to the trial, together with the issue of Francis's employment status, and after briefly holding the matter *sub curia,* Judge Bowen, reasoning that it was a nonprofit corporation within the meaning of *Md. State Fair, supra,* allowed the Association to assert the defense of charitable immunity "to the extent that it is not covered by liability insurance." Several days later, the case came on for trial, and nowhere in the record have we found any indication that during those proceedings the Association made further reference to its defense of charitable immunity, although the trial judge briefly mentioned it when, at the end of the plaintiffs' case, he extended the defense to cover Wood.

The jury verdict was returned on April 6, 1972, and at that time Judge Bowen announced in open court the judgments *nisi* in accordance with the amounts of the jury verdict. Final judgments were entered in those amounts on April 12. On May 11, the Association noted its appeal and on the same day moved to set aside the judgments, raising for the first time since Judge Bowen's pretrial decision the point which it now asserts here regarding the entry of judgment before there was a determination of coverage. No ruling was ever made on that motion, and it is suggested that the trial court did not do so because it had lost jurisdiction by the filing of the appeals.

Rule 626, which the Association cited in the trial court, but not here, provides:

> "When the defense of partial immunity has been raised and determined in favor of the defendant pursuant to Section b of Rule 323 . . . *and the damages awarded exceed the limits of available insurance as determined by the court,* the court shall not enter judgment against the defendant

in an amount greater than the limits of such insurance." (emphasis added)

Presumably, the Association now recognizes that the rule has no application to the facts here. It does not contend, as Rule 626 obviously contemplates, that the verdict exceeded the available coverage. The amount of coverage seems shrouded in secrecy and, judging from the Association's reluctance to reveal it, even at oral argument before this Court, one gathers that the sole basis for asserting immunity is the contention that since Francis was a "regular" employee, and not a "casual employee," there was no coverage at all for this particular accident under the applicable exclusion. If we are correct in this assumption, it would seem that we have disposed of the issue by our holding that Francis was a casual employee. If, however, our holding is not dispositive, the matter can perhaps be considered by the trial judge when that court reacquires jurisdiction. In any event, we decline to consider the issue here, since we think it has not been properly preserved for our review because it was not timely presented to the trial judge. Rule 885.

### (4)

The contention by Wood that the trial court erred in not directing a verdict is grounded essentially on the argument that there was insufficient evidence to take the issue of negligence to the jury, and that the submission of that question compelled the jury to speculate. We do not see it that way.

The reasoning on this point is that even assuming it was negligent for Wood to alight from the tractor while it was in gear (reverse), there was no evidence that this occurred here, for which he cites his testimony, "I don't think it was in any gear," and "To the best of my belief, I do not believe it was in gear, when I dismounted." In making this argument, Wood, although professing recognition, seems to have lost sight of the now-axiomatic

principle that in determining whether a plaintiff has produced sufficient evidence to go to the jury, the evidence produced, as well as all legally permissible inferences drawable therefrom, must be considered in the light most favorable to the plaintiff, *Green v. Otenasek*, 267 Md. 9, 15, 296 A. 2d 597 (1972) ; *Baulsir v. Sugar*, 266 Md. 390, 394-95, 293 A. 2d 253 (1972) ; *Durante v. Braun*, 263 Md. 685, 689, 284 A. 2d 241 (1971).

Furthermore, Wood has also disregarded additional testimony he gave, portions of which bear quoting here:

"Q. Let's say initially that you would leave the engine running. A. You put the tractor in neutral and put the parking brake on.

"Q. And then dismount? A. Yes.

"Q. And would the tractor be in a position at that point to react in any way after you had put it in neutral? A. It is possible.

"Q. In what way would it be possible? A. If you knocked it in gear when you got off.

"Q. Meaning if you accidentally hit something that put it in gear? A. Yes.

"Q. *If you had left it in neutral and had not touched it there would be no way that it could jump around, or anything like that, is that correct?* A. *That's correct.*

"Q. Now, what would be the problem if you left it in gear? A. If you left it in gear and got off the tractor?

"Q. Yes. A. The tractor would move unless the engine stalled.

"Q. *So, this would be a problem that you would have to be careful about, is that correct?* A. *That's correct.*" (emphasis added)

Immediately following the testimony we quoted earlier in which Wood said he did not believe the tractor was in gear, appears the following:

"Q. Is it possible that it might have been in a gear? A. It could have been in a gear. . . .

\* \* \*

"Q. Do you specifically recall checking? A. No, I really can't say for sure that I went through a neutral check. I really can't say."

There was also testimony by a witness called as an expert from which the jury could have found that if one dismounted while the tractor was in gear, it would move, and that if the "normal" procedure of putting it in neutral were followed, it would not move.

Clearly, in light of the tests we mentioned earlier, there was sufficient evidence to permit the jury to find that Wood, who testified he had extensive experience in operating tractors such as the one employed in this case, jumped from the tractor while it was in gear, or that in alighting, he pushed it into gear; and that for an experienced owner and operator to do so was negligent.

Wood seizes upon the following testimony which he gave:

"Q. Do you have any idea what caused it to go backwards? A. Two things. Either it was in gear, or my leg pushed it in gear."

He argues that this was "not a statement of fact but an 'idea,' a mental process, a speculation, none of which are a proper foundation for a jury verdict." There are two short answers to this contention. The first is that it blithely disregards the remainder of his testimony as well as that of other witnesses, portions of which we quoted earlier; and secondly, it is removed from context by the omission of the answer which immediately follows the portion quoted by him:

"Q. It would be one of those two things? A. *It would have to be one or the other.*" (emphasis added)

Judge Bowen ruled correctly in denying Wood's motion for a directed verdict, and in submitting the issue of negligence to the jury.

### (5)

At the conclusion of all the evidence, Judge Bowen thoroughly and correctly instructed the jury upon negligence and proximate cause, to which there was no exception, and also said:

> "Now one final word and I put this at the end, because I want to emphasize it applies to liability, as well as damages, the Plaintiffs have the burden of proof. . . .
>
> ". . . And in this connection, you are further advised that the mere happening of an accident is not in and of itself evidence of negligence on the part of anyone. The Plaintiffs have the burden to show you that the Defendant was negligent and that that negligence was the proximate cause of the injury. . . ."

Although he took no exception to that portion of the instructions, Wood now contends that the trial judge "failed to instruct properly on the plaintiffs' burden of proof and instructed improperly on negligence itself." We have carefully reviewed the entire charge to the jury and find that it thoroughly and accurately stated the principles applicable to negligence and the burden of proof.

While Judge Bowen commented upon certain phases of the evidence, he carefully explained to the jury that any reference to the facts by the court was for the purpose of illustrating applicable principles of law. In no way was the jury's province as the trier of the fact usurped, since it was clearly told that it was to determine for itself "the weight of the evidence and the credit to be given to the witnesses." Rule 554 b 2. Nor was there any error in the court's choice of examples to il-

lustrate what it meant by "inferences." Actually, they were carefully considered, and Judge Bowen made it demonstrably clear to the jury that it could draw inferences not suggested by him or, indeed, that it need not draw any at all.

At the conclusion of the court's original instructions, in response to a request by the plaintiffs and over Wood's objection, the court stated to the jury:

> "In this connection, it is not the Plaintiff's burden or responsibility to prove a particular or specific act of negligence as between two or more provided you are satisfied that any of the two or more would constitute grounds for recovery. The law does not require that you single out and determine a specific given act or a specific single negligent act, simply that you be satisfied that the negligence is the proximate cause of the injury and that there was that negligence."

Wood claims the court erred in giving the additional instruction, arguing merely that it singled out negligence "from the rest of the Court's instructions . . . and tended to cause the jury to believe the Court was instructing it that the defendant Wood was in fact negligent." We do not agree with this contention. First, it completely overlooks what Judge Bowen immediately went on to tell the jury:

> "Finally, I want to say to you ladies and gentlemen that everything I have said in these instructions and comments which deal with facts or lines of testimony is intended as I said in the beginning to be illustrative only on the principles of law, not to indicate to you how I think the testimony ought to be evaluated, weighed or determined from the facts. You have that responsibility and the Court has no opinion as to how this case ought to be decided

or anything else other than as to the matters of law which we have instructed you and which instructions are binding."

Actually, this was merely repetitious of what he had already carefully pointed out to the jury. We have held that in appropriate circumstances, where the jury is properly cautioned, it is not error for the trial judge to amplify his charge. *Fisher v. Baltimore Transit Co.,* 184 Md. 399, 41 A. 2d 297 (1945).

It seems to us that in contending the supplemental instructions failed to take into account the plaintiffs' burden of proving negligence and proximate cause, Wood has plainly overlooked the instructions to that effect previously given by Judge Bowen. Nor, for the same reason, is there any merit in the argument that the additional instructions amounted to the direction of a verdict. When the instructions are considered as a whole, it becomes apparent that they fairly and correctly stated the law, *Baltimore & O. R.R. v. Plews,* 262 Md. 442, 462, 278 A. 2d 287 (1971); *Morris v. Christopher,* 255 Md. 372, 378, 258 A. 2d 172 (1969); *Nora Cloney & Co. v. Pistorio,* 251 Md. 511, 515, 248 A. 2d 94 (1968). Hence, we are not persuaded that the jury was misled by the particular instruction challenged here.

## (6)

In urging that the issue of Francis's contributory negligence should have been submitted to the jury, appellants point to nothing more in the evidence for this contention than the fact that Donald avoided injury by jumping aside. We do not understand them to be contending that Francis was guilty of negligence merely because he stood to the rear of the tractor. In any event, there could be no merit in that contention, as Francis was not bound to anticipate Wood's negligence, *Baltimore & O. R.R. v. Plews, supra; Sanders v. Williams,* 209 Md. 149, 120 A. 2d 397 (1956).

In *Sanders,* a patron in a filling station was struck when, while he was standing in front of an automobile being serviced, an operator of the station accidentally applied the gas and the car suddenly lurched forward. Regarding the contention made there that the jury should have been allowed to decide whether the patron contributed to his injury by negligently putting himself in a position of danger, Judge Hammond said for the Court:

"As is true of primary negligence, one measure of contributory negligence is the need, in a given situation, to anticipate danger. Presence or absence of reasonable foresight is an essential part of the concept. One is charged with notice of *what a reasonably and ordinarily prudent person would have foreseen* and so must foresee what common experience tells may, in all likelihood, occur, and to anticipate and guard against what usually happens. On the other hand, *one is not bound to anticipate every possible injury that may occur or every possible eventuality.* . . . Absent actual or constructive knowledge to the contrary, one may act on the assumption that he will not be exposed to danger that will come only by the breach of duty which another owes him. *He is not bound to anticipate negligent acts or omissions on the part of others unless,* under the circumstances, *an ordinarily prudent person would know,* or should know, *that it was not safe to make the assumption* of due care on the part of the other person. . . . The standard of care to be used in measuring contributory negligence is the conduct of an ordinarily prudent person under the same or similar circumstances, and *not that of a very cautious person,* and even if the doing of what was done turns out to have been an error of judgment, this of itself does not make the act negligent if an ordinarily prudent person

would have made what proves to have been the same error. We think that the appellee neither did, nor failed to do, anything that an ordinarily prudent person would not have done or failed to do. In the vernacular, he was merely standing there minding his own business.

"This being so, obviously it would have been error to have instructed the jury that it could find appellee to have been negligent. . . ." 209 Md. at 152-53 (emphasis added).

What appellants' argument for contributory negligence comes down to, then, is that Francis was culpable in having failed to evade the tractor as Donald did. The weakness in this contention is that the evidence fails to disclose that Francis had sufficient opportunity to avoid injury. Indeed, the only evidence in this connection is that Wood caught a glimpse of Francis shielding himself with his hands. The evidence is silent on how far Francis was from the tractor when it started up and how much time elapsed before he was struck.

Appellants' argument is merely attenuated by the well-established rule, applicable here, that Francis is presumed to have exercised due care for his own safety, *Bratton v. Smith,* 256 Md. 695, 261 A. 2d 777 (1970) ; *Gresham v. Commissioner of Motor Vehicles,* 256 Md. 500, 260 A. 2d 649 (1970) ; *Nizer v. Phelps,* 252 Md. 185, 249 A. 2d 112 (1969) ; *Young v. Dietzel,* 13 Md. App. 159, 282 A. 2d 150 (1971). This presumption is countered only by speculation which does not even rise to the level of a scintilla of evidence that Francis failed to act as a reasonably prudent person. Similarly to the victim in *Sanders v. Williams, supra,* "he was merely standing there minding his own business." Judge Bowen correctly refused to submit the issue of contributory negligence to the jury.

## (7)

For its final gasp, the Association contends that the trial judge erred in refusing to apply the common-law

doctrine of fellow servant. When one considers the degree to which the Workmen's Compensation Law has been broadened in the years following its original adoption, the reason for the wane of the fellow servant rule becomes apparent. This decline is illustrated by the fact that the most "recent" reported decision of this Court is *Jarka Company v. Gancl,* 149 Md. 425, 131 A. 754 (1926).

The Association recognizes that an exception to the fellow servant rule applies where the negligent employee acts in the capacity of a vice-principal, *Jarka, supra; Chesapeake Stevedoring Co. v. Hufnagel,* 120 Md. 53, 87 A. 4 (1913) ; *Frizzell v. Sullivan,* 117 Md. 388, 391, 83 A. 651 (1912). For an illuminating discussion of the "vice-principal" concept, see Prosser, *Law of Torts,* § 80 (4th Edition).

In our view, *Jarka* is the controlling authority. There, a stevedore sued his employer for injuries sustained when a slingload of potash, which had been hoisted by a steam winch and cable to the level of the hatchway, in the course of transfer to a scow alongside the vessel, slipped back into the hole and upon the injured employee. The load had been held by the hoisting winch for a period of approximately ten minutes at the hatch level because the foreman discovered that the scow was not sufficiently close to the steamer, and called the side winchman away from his regular post in order to assist him in pulling the scow nearer to the ship. If the foreman had not called the side winchman away, the load would have been transferred promptly to the scow and it would not have been in a position to descend upon the injured employee. In considering the defense of fellow servant, the court said:

> "The rule in this state is that the superior rank of the employee whose negligence causes injury to a workman serving under his direction is not decisive upon the question as to the employer's liability. The controlling inquiry is

whether the authority which was exercised negligently has relation to a duty which the employer was primarily and absolutely obliged to have properly performed. . . ." 149 Md. at 431.

Quoting from prior decisions of this Court, it was then said that:

" '[W]hen the business of the master is such that the safety of one servant depends upon the way in which other servants do their work, *it is the duty of the master to adopt, promulgate and enforce reasonable and sufficient rules to protect* and promote the safety of its employees exposed to danger.' . . . The defendant's obligation to regulate the work in the interest of the workmen's safety should not be judicially declared to have been fulfilled because the control of the related activities of the various employees was committed to the foreman's discretion." *Id.* at 432 (emphasis added).

This view continues to enjoy current recognition. Prosser lists five nondelegable common-law duties which a master owes to his employee. The fifth is:

"The duty to promulgate and enforce rules for the conduct of employees which would make the work safe."

This is precisely the rule which we quoted above as the basis for the decision in *Jarka,* and, in view of the parallel factual situations, we find it apposite here. Indeed, the case at bar presents a stronger one for the application of this rule, since Wood was not merely foreman, but "doubled in brass" as vice president and general manager. The concept of "vice-principal" seems to fit squarely in this case. We think Judge Bowen was correct in refusing to apply the fellow-servant rule here.

(8)

Having already ruled prior to the commencement of trial that the Association was entitled to the defense of charitable immunity, Judge Bowen, at the conclusion of the plaintiffs' case, extended the cloak of immunity to cover Wood. Appellees acquiesce in the application of immunity to the Association, but, by their cross-appeal, challenge the trial ruling in favor of Wood. In addressing ourselves to the issue presented by the cross-appeal, we are not to be understood as necessarily indicating our agreement with the underlying pretrial decision.

The doctrine of charitable immunity, as applied not only in Maryland but in other jurisdictions as well, was carefully traced for this Court by Judge Finan in *Howard v. Bishop Byrne Home*, 249 Md. 233, 238 A. 2d 863 (1968). In view of his scholarly analysis of the subject there, no useful purpose would be served by an extensive summary of the many reported decisions on this doctrine. Hence, we shall refer only to those cases which contribute to a resolution of the narrower issue before us. Suffice it to say, the question whether immunity should be extended to cover the negligent employee of a charitable institution seems never to have been decided by this Court, and, ironically, there is a paucity of authority elsewhere, even though cases on the basic subject abound.

The earliest case decided in Maryland, and the second-oldest in this country as well, was *Perry v. House of Refuge*, 63 Md. 20 (1885). That case and the seminal case of *McDonald v. Massachusetts General Hospital*, 120 Mass. 432 (1876), on which *Perry* is, in part, based, have assumed landmark proportions in this country. Strangely enough, both are bottomed on the English case of *Feoffees of Heriot's Hospital v. Ross*, 12 Clark & Fin. 507, 8 Eng. Reprint 1508 (1846) ; yet, the doctrine has long since been abrogated in that country. Indeed, as we noted in *Howard v. Bishop Byrne Home, supra*, while charitable immunity remains alive and reasonably well in Maryland, it has fallen into disfavor elsewhere in

this country. For example, in the mere five years since *Howard* was decided, ten more states have jettisoned the doctrine.

*Heriot's Hospital* and *McDonald* are of particular interest, as they relate to Maryland law, in that our predecessors derived from those cases the "trust fund" theory on which charitable immunity has historically been founded in this state. Quoting Lord Cottenham, this Court, in *Perry,* adopted the rule:

> " 'There is a trust, and there are persons intended to manage it for the benefit of those who are to be the objects of the charity. To give damages out of a trust fund would not be to apply it to those objects whom the author of the fund had in view, but would be to divert it to a completely different purpose.' " 63 Md. at 27.

Since *Perry* was decided, this Court has consistently upheld the doctrine on the same theory. However, in none of our decisions has the "trust fund" theory ever been applied to immunize the negligent employee, and we observe more than a hint to the contrary. In *Perry,* this apt statement by Lord Campbell in *Heriot's Hospital* was quoted:

> " 'It seems to have been thought that if charity trustees are guilty of breach of trust, the persons damnified thereby have a right to be indemnified out of the trust funds. That is contrary to all reason and justice and common sense. Such a perversion of the intention of the donor would lead to the most inconvenient consequences. The trustees would, in that case, be indemnified against the consequences of their own misconduct, and the real object of the charity would be defeated. * * * *Damages are to be paid from the pocket of the wrongdoer, not*

*from a trust fund.'* " 63 Md. at 27 (emphasis added)

In *Loeffler v. Sheppard-Pratt Hospital,* 130 Md. 265, 100 A. 301 (1917), our predecessors quoted with approval from the Michigan case of *Downs v. Harper Hospital,* 101 Mich. 555, 25 L.R.A. 602, where the court said:

> " 'Charitable bequests can not be thus thwarted by negligence for which the donor is in no manner responsible. If in the proper execution of the trust, a trustee or employee commits an act of negligence, *he may be held responsible for his negligent act;* but the law jealously guards the charitable trust fund, and does not permit it to be frittered away by the negligent acts of those employed in its execution.' " 130 Md. at 270 (emphasis added).

In *Loeffler,* the Court referred to the case of *Hill v. President & Trustees of Tualatin Academy & Pacific University,* 61 Or. 190, 121 P. 901 (1912). This is the only reported decision we have found which can be said to have addressed itself directly to the issue presented here. It is important to note that in *Hill,* the Oregon court adopted the trust fund theory. Respecting liability of the individual, the court there said:

> *"Though an action may be maintained against an officer, servant, or employe of a charitable institution to recover damages* for an injury caused by the act or omission of such person, *the action must be against him* in his individual, and not in his corporate, capacity, so that, if a recovery is awarded, it will not be discharged from the trust funds. (citing *Heriot's Hospital)* " 121 P. at 905 (emphasis added).

In sum, when we bear in mind the historical background of the charitable immunity doctrine as applied in this state, there is no sound reason for extending the

cloak to a negligent employee. Recovery against him can in no way do violence to the "trust fund" theory, upon which the doctrine is predicated. Nothing has been presented here to support a conclusion that recovery against Wood would lead to an invasion of trust funds held by the Association, if there are any. Thus, the trial judge erred in ruling that the defense of charitable immunity was also available to Wood.

> *Judgments against St. Mary's County Fair Association, Inc. and Glen Wood, Jr. affirmed; judgment that doctrine of charitable immunity applies to Glen Wood, Jr. reversed; remanded for further proceedings not inconsistent with this opinion; appellants to pay costs.*