638 A.2d 743

Douglas Paul ABRAMSON,

v.

Ori REISS et al.

No. 95, Sept. Term, 1993.

Court of Appeals of Maryland.

March 23, 1994.

Ronald M. Abramson, argued by Ronald S. Canter, Bethesda, for appellant.

Abbe David Lowell (William Maxwell Hathaway, Brand & Lowell, all on brief), Washington, DC, for appellee.

Before ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, ROBERT M. BELL, BAKER, CHARLES E. ORTH, Jr., (Retired, Specially Assigned) JJ.

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

A broken nose suffered in a basketball game has ballooned into a request that Maryland's century-old charitable immunity doctrine be judicially abrogated.

## I

On 2 January 1992 Douglas Paul Abramson and Ori Reiss, members of the Jewish Community Center of Greater Washington, Inc., were opponents in an apparently informal basketball game played on the JCC's court. During the game

Abramson was allegedly struck on the nose by Reiss, breaking it and causing other facial injuries. Abramson instituted an action in the Circuit Court for Montgomery County against Reiss and the JCC. In an Amended Complaint he sought damages from Reiss for assault and battery (1st count), for malicious prosecution (2nd count),[1] and for negligence (3rd count). These complaints were ultimately disposed of by a "Stipulation of Dismissal" filed by Abramson's attorneys. The stipulation requested that the suit be marked as " 'Settled and Off' and dismissed with prejudice as to all claims as to Defendant Ori Reiss." The Amended Complaint also sought damages from the JCC for breach of contract (4th count) and for negligence (5th count). The damages demanded on each of these counts was $250,000 plus court costs.

The JCC filed a Motion to Dismiss the two counts against it on the ground that Abramson's claims were barred by the doctrine of charitable immunity.[2] The JCC asserted:

That doctrine precludes [Abramson] from recovering damages for the tortious conduct of an uninsured eleemosynary institution, such as the JCC, whose assets are held in trust in furtherance of its charitable purposes.

"Because of its status," the JCC declared, "it cannot be sued under a tort theory of liability." As to the claim under the 4th count, allegedly for breach of contract, the JCC explained:

---

**1.** Abramson apparently sought criminal charges against Reiss. Reiss then filed a criminal complaint against Abramson, an action that inspired the malicious prosecution count.

**2.** *See* Maryland Rule 2-322(c), which prescribes in relevant part:

If, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 2-501, [Motion for Summary Judgment,] and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 2-501.

Of course, the defense of charitable immunity may be raised by a Motion for Summary Judgment. It also may be presented as an affirmative defense in an Answer to a Bill of Complaint. *See* Md. Rule 2-323(g)(21).

[I]t is really the same negligence claim that is alleged in [the 5th count]: The count is based upon the alleged negligence of the JCC and seeks identical damages. For this reason, it too is a proper subject of this motion to dismiss.

## II

The Motion was supported by a Memorandum of Points and Authorities. Extensive argument was presented in the Memorandum. The first phase of the argument dealt with the existence of the doctrine in Maryland and its present status. (Paragraph II A). The second phase of the argument (paragraph II B) was to the effect that the JCC is a recognized Maryland charitable institution entitled to charitable immunity. Appended to the motion was an affidavit of Jay Manchester, the JCC's Director of Administration and Chief Financial Officer. His affidavit provided, in substantive part, the basis for the argument set out in the JCC's Memorandum of Points and Authorities supporting its Motion to Dismiss. Manchester declared in ¶ 3 of his affidavit:

As the Director of Administration and Chief Financial Officer of the JCC, it is within the scope of my responsibilities to negotiate and obtain various business-related contracts, including insurance coverage, if any, for the JCC. It is also within the scope of my responsibilities to be aware of the JCC's existing contracts, whether negotiated and obtained by me or by someone else.

He was not aware of any contract of liability insurance carried by the JCC at the present time or at the time of Abramson's injury. He emphasized:

The net earnings of the organization in no way inure to the benefit of individuals or private shareholders. Rather, the net earnings of the JCC, if any, are always reallocated to the organization's programs and services.

Paragraph 4. He explained:

The assets of the JCC are held in trust in furtherance of its charitable purposes. The JCC has opted not to carry

insurance in order to devote its assets exclusively to its charitable purposes.

*Id.* We note that the Legislature has enacted a statute with respect to charitable institutions that choose to carry liability insurance. Maryland Code (1957, 1991 Repl. Vol.) Art. 48A, § 480. In the absence of such insurance, a negligence action cannot be maintained against a charitable institution. *See McCormick v. Church,* 219 Md. 422, 431, 149 A.2d 768 (1959). We looked to the legislative history of Article 48A, § 480 in *Howard v. Bishop Byrne Home,* 249 Md. 233, 236, 238 A.2d 863 (1968). We observed that the General Assembly had the opportunity to abrogate the common law doctrine of charitable immunity at that time but declined to do so. The statute it enacted, Article 48A, § 480, did no more than restrict the use of the doctrine by an insurer, not by the charitable institution. It thus assured that a charitable institution which opted for insurance would receive the full benefit of the coverage it had obtained without disturbing the doctrine under other circumstances. *See State v. Arundel Park Corp.,* 218 Md. 484, 487–488, 147 A.2d 427 (1959).

In ¶ 5 of Manchester's affidavit, he observed that it was also within the scope of his responsibilities to be aware of the JCC's corporate status and its purposes, programs and services. He swore that

> the JCC is a tax-exempt organization organized for charitable purposes. In addition, it is registered as a charitable organization within the State of Maryland.

Paragraph 6. Md.Code (1957, 1990 Repl.Vol.) Art. 41, § 3–201(b)(1) defined "charitable organization" to mean:

> a person that is or holds itself out to be a benevolent, educational, philanthropic, humane, patriotic, religious, or eleemosynary organization and solicits or obtains contributions solicited from the public for charitable purposes.[3]

---

**3.** Maryland Code (1957, 1990 Repl.Vol.) Art. 41, §§ 3–201 to 3–219 were repealed by Acts 1992, ch. 4, § 1, effective 1 Oct. 1992. *See* Md.Code (1992, 1993 Supp.) § 6–101 et seq. of the Business Regulation Article.

Also appended to the Motion to Dismiss was a letter from the Internal Revenue Service to the JCC. It declared:

A search of our files indicates that the [JCC] is exempt from Federal Income Tax under Section 501(c)(3) and other than a private foundation described in Section 509(a)(2) effective November 1987.

The letter stated that "this letter may be used to verify your tax-exempt status."

The registration of the JCC as "a charitable organization within the State of Maryland" was pursuant to Article 41, § 3–202(a):

Every charitable organization located in this State which intends to solicit contributions within or without this State, or every charitable organization which intends to solicit contributions within this State or to have funds solicited on its behalf shall file a registration statement with the Secretary of State upon forms prescribed by the Secretary of State prior to or upon the commencement of any solicitation.

Thereafter, if the organization intends to engage, or does engage in solicitation, it shall file an annual report. *Id.* Subsection (b)(1) (i through ix) prescribed what the registration statement shall contain. Article 41, § 3–209 set out:

All registration statements, annual reports, fund-raising counsel contracts, professional solicitor contracts, and other documents and information filed under this subtitle with the Secretary of State are public records. They shall be maintained in the office of the Secretary of State for at least two years, and shall be available to the general public for inspection and photocopying, at reasonable prices, during the normal business hours of the Secretary of State.

Paragraph 7 of Manchester's affidavit discussed the activities of the JCC.

The JCC is a United Way volunteer agency. In this capacity, it provides valuable services to new immigrants to the United States, the elderly, the underprivileged, the disabled, and the community's youth. The JCC provides these services to its community without regard to the race,

religion, gender or ethnic background of the recipient. For example, in the past year alone, the JCC has enabled over 700 Russian immigrants to learn English through classes and one-on-one home tutoring. Moreover, it has enabled approximately 350 immigrants from Vietnam as well as Hispanic, Asian, African and many other countries to learn the English language. The JCC's goal is to facilitate the immigrants' ability to obtain jobs and become productive and self-reliant American citizens.

"In addition," Manchester continued:

the JCC's summer camps have provided a welcome to the United States for approximately eighty Russian immigrant children from the ages of two through fourteen enabling them to make American friends and obtain a head start in the English language so that they will be better prepared as they enter local schools. Moreover, the JCC provides ongoing hot meals programs and socialization services for approximately 140 new immigrants and senior citizens, combatting the isolation and depression suffered by older people in a new country.

*Id.* Manchester pointed out:

For the past fourteen years, the JCC has been a nationally-recognized pioneer in mainstreaming handicapped children into regular camp activities based upon the individual child's ability to succeed. Many of these children enter the camp with low self-esteem. Success in the summer programs helps to build a basis of self-esteem upon which they can achieve other successes. Over the course of the past year alone, the JCC's summer camps have served approximately two hundred physically, emotionally and mentally handicapped children and adults. These summer programs provide these special individuals with much-needed independent living skills, friendships, and ongoing education.

*Id.* Furthermore,

the JCC provides meals to the community's senior citizens. The JCC serves senior citizens approximately 800 hot kosher meals per week in nine different locations throughout

Montgomery and Prince George's counties. The service is free of charge for those who can not afford to pay, with only a nominal cost for those who can afford payment.

*Id.* Manchester declared that "[t]he JCC is also a responsible member of its community. For instance"

the JCC was instrumental in planning and hosting a major community-wide conference on affordable housing. the JCC also conducts a massive teen volunteer program of recruiting and placing three hundred teenagers per year as volunteers throughout the community, teaching them the value of giving to others. As volunteers, they work in nursing homes, clean up streams and public parks, help with handicapped children and perform one-on-one peer counseling with troubled teens.

Paragraph 8 of Manchester's affidavit explained that the costs associated with many of the JCC's charitable services are defrayed by extending memberships to interested citizens. However,

[t]he only services that require actual membership in the JCC are the sports and fitness facility—with the exception of individuals who use the facility as part of a health-related activity such as a cardiac program—, and the JCC's day care and preschool programs. For those who can not afford to pay the membership fee, the JCC provides membership scholarships. During the past year, the Center has already provided over $250,000 dollars worth of membership scholarships. No one in need is ever turned away. For its members, the Center provides free after school care for elementary age school children grades three through seven and licensed after school day care for children Kindergarten through second grade.

Impressed on all of this is the sworn declaration of the JCC's Director of Administration and its Chief Financial Officer that the net earnings of the JCC, if any, "are always reallocated to the organization's programs and services." The JCC's Motion to Dismiss urged that, in the light of its full compliance with the "Charitable Organization Solicitations"

statute, its acceptance as a tax-exempt organization by the Internal Revenue Service, its acceptance by the Secretary of State of Maryland as a charitable organization, the charitable nature of its many and varied activities and the allocation of such income and fees it obtains in furtherance of its activities,

[t]he JCC is clearly an uninsured charitable organization devoted to religious, educational and community welfare services. Its assets are entirely committed to the further-ance of its charitable purposes.

Therefore, the JCC declares, it is entitled to the application of the charitable immunity doctrine recognized in Maryland.

### III

### A

Abramson took several positions in opposing the JCC's Motion to Dismiss. He deemed the use of the JCC's sports and fitness facilities for a fee of $350 to be a contract, not a mere membership privilege. The contract, he suggested, im-plied a responsibility on the part of the JCC that the facility be operated in a safe and secure manner. He claimed that the JCC breached this contract resulting in his injury. He argued that the charitable immunity doctrine is applicable only to torts; it does not apply to contracts.

Next, Abramson contended that the use of the sports facili-ties was a commercial venture and not a charitable activity. He argued that the operation of a sports and fitness facility "is so entirely disengaged from [the JCC's] charitable functions that [the JCC] should be barred from invoking immunity with respect to its negligent supervision of the sports facility."

Finally, Abramson, urged, "The charitable immunity doc-trine should be abolished in light of modern tort law." He asserted that "[t]he charitable immunity doctrine is a relic of the past."

### B

The JCC replied to Abramson's opposition to the Motion to Dismiss. It stated that the alleged contract claim was in

actuality not ex contractu but ex delicto, in that the proximate cause of Abramson's injury was the alleged negligence of the JCC and not of any breach of contract. The JCC characterized as "artificial" Abramson's distinction between commercial and charitable activities in the circumstances here and pointed out that, in any event, its brochure, appended to Abramson's reply, warned that the utilization of the JCC's facilities and programs are at the members' own risk. As for Abramson's notion that the charitable immunity doctrine should be abrogated, the JCC observed that neither this Court nor the Legislature has seen fit to do so in over a century.

## C

The Circuit Court for Montgomery County conducted a hearing on the Motion to Dismiss. After extended argument by counsel, the judge ruled that the JCC's concept of the law was correct and that the so-called breach of contract count arose in negligence; it was "in fact a negligence count." The judge stated that he would grant the motion as to both counts IV and V. Whereupon the judge ordered:

Upon consideration of the Defendant Jewish Community Center's ("JCC") Motion to Dismiss counts IV and V of [the JCC's] amended complaint on grounds of charitable immunity, and the accompanying Memorandum of Points and Authorities, the Court finds the following: That the JCC is an uninsured charitable institution whose assets are held in trust in furtherance of its charitable purposes. The charitable immunity doctrine is, therefore, applicable to the JCC and it is immune from actions sounding in tort. Accordingly, it is, this 26th day of Jan., 1992;

ORDERED that the JCC's Motion to Dismiss counts IV and V of [Abramson's] amended complaint is GRANTED; it is further,

ORDERED that counts IV and V of [Abramson's] amended complaint are DISMISSED, with prejudice; it is further,

ORDERED that [Abramson's] amended complaint against the JCC is DISMISSED.

IT IS SO ORDERED.

As we have seen, Abramson "dismissed with prejudice ... all claims as to ... Ori Reiss." Abramson noted on appeal. On our own motion, we ordered the issuance of a writ of certiorari 332 Md. 449, 631 A.2d 906.

## IV

■ We are in accord with the trial judge that the JCC's concept of the law is correct.

## A

■ As for Abramson's breach of contract count, even assuming he had a contract with the JCC, we believe that the trial court correctly saw it as a negligence claim in everything but name. In examining whether a particular action arises in negligence or in contract, *Prosser and Keeton on the Law of Torts* observes:

> Where the particular point at issue is one of adjective law only, affecting the suit or its procedure, but not the merits of the cause of action, the courts have tended to be quite liberal in giving the plaintiff his freedom of choice, and have upheld his action of tort or contract as he has seen fit to bring it. Likewise where the point is one affecting substantive rights, but the claim is one for damages to property or to pecuniary interests only, the tendency has been, with some occasional dissent, to allow the election. *But when the claim is one for personal injury, the decision usually has been that the gravamen of the action is the misconduct and the damage, and that it is essentially one of tort, which the plaintiff cannot alter by his pleading.*

W. Page Keeton, *Prosser and Keeton on the Law of Torts* (5th ed. 1984) § 92 at 666–667 (emphasis added) (footnotes omitted). This is in accord with Maryland law.

In *Benson v. Mays*, 245 Md. 632, 227 A.2d 220 (1967), this Court was presented with a medical malpractice case in which the parties disputed whether the action was one sounding in tort or in contract. The injured plaintiff accused the defen-

dant doctors of having "impliedly warranted" to attend to him "with skill and care...." 245 Md. at 635, 227 A.2d 220. Indeed, the plaintiff contended, in every doctor-patient relationship the physician impliedly contracts or warrants to his patient that he possesses and will use a reasonable degree of care and skill in the performance of his duties; and that when the physician fails to apply this degree of care, skill and learning, he breaches his implied contract.

*Id.* at 636, 227 A.2d 220. We held that, in examining a cause of action, "we must consider its substance and not its mere form." *Id.* at 637, 227 A.2d 220.

> Without question, the gist or gravamen of [the plaintiff's] cause of action consists in the alleged negligent acts and omissions of the defendant physicians and hospitals, which allegations have been expressly incorporated into and constitute the essence of the charges underlying and supporting the warranty counts of the declaration....

*Id.* Despite the presence of warranty counts in the plaintiff's declaration, "the essential nature of the action" was tort, not contract. *Id.* Abramson's complaint against the JCC is one sounding in tort; asserting it to be also in contract makes it no broader. In determining whether an action is in contract or in tort, we must examine the basic allegations contained in the complaint rather than the form adopted by the party who has chosen to present the case.[4]

### B

■ As for Abramson's contention that the JCC's sports facilities were a commercial venture and not a charitable activity, we start with the observation that Abramson did not question the JCC's status as a charitable organization. Nor did he challenge its purposes or its charitable works. Basically, his contention was that the JCC embarked on a course that took it beyond its original goals by offering recreational

---

**4.** For an analytical discussion on divining whether an action sounds in tort or in contract, *see McClure v. Johnson,* 50 Ariz. 76, 84–88, 69 P.2d 573, 577–578 (1937).

facilities to the public. The JCC countered that money collected from its sports operation supports the programs that form the organization's core purpose. Moreover, the JCC added, the sports facilities are in keeping with its mission because they are used by many of the organization's membership and outreach programs in furtherance of its charitable function.

In *Howard v. Bishop Byrne Home,* we were asked to hold a charitable institution liable for torts committed in the course of non-charitable activities. 249 Md. at 243, 238 A.2d 863. Under the facts before us then, such a decision would have been premature. But we did say we were not "inclined to admit the soundness of this rule." *Id.* For one thing, such a holding would raise "detailed factual investigations and queries as to what is a proprietary as opposed to charitable function...." We asked, "[H]ow does one classify the activity of a church bazaar, for example?" *Id.*

■ We are cognizant of the practical problems recognized in *Howard* if a charitable institution is held liable for torts committed in the course of some non-charitable activity. And we are still not inclined to admit the soundness of such a rule. Even if an organization has both charitable and some non-charitable programs, if the predominant character of the organization is charitable, it will normally retain its immunity in tort. In other words, if its corporate activities are primarily charitable in character, the organization will ordinarily preserve its immunity in tort despite some incidental activities that may seem to be outside the core of its charitable work. Thus, when a church has a bazaar or a bake sale or conducts a bingo night, or when an organization charitable in nature operates a gift shop or a second-hand clothing outlet to raise money in furtherance of its charitable functions, its charitable immunity is not endangered where the incidental activities do not alter the predominantly charitable character of the organi-

zation.[5] It is apparent from the record that the JCC's predominant character is charitable in nature, and that this character was not altered by the incidental operation of its recreational facility.

## C

As for Abramson's urging that the charitable immunity doctrine should be judicially abolished because it is a "relic of the past" in light of modern tort law, we have steadfastly refused to do so.

In *Howard v. Bishop Byrne Home,* 249 Md. 233, 238 A.2d 863, this Court was asked once again

> to overthrow the long established doctrine of immunity of charitable organizations from tort liability, for the reasons that it is an anachronism, a slave of *stare decisis,* a source of wrongs committed without a remedy, and against the "weight" of modern authority.

*Id.* at 234, 238 A.2d 863. We observed, *id.,* these arguments "have all been presented before this Court at some time or another, and, of course, have been found not persuasive." Since the Court's last review of the matter was in 1959, however, the Court thought that the time was ripe to review the question again. *Id.* The Court then carefully traced the development of the doctrine in this State from the first of its cases to recognize the doctrine, *Perry v. House of Refuge,* 63 Md. 20 (1885), until the *Howard* case again presented the question. The Court referred to legislative action on the matter, reflected in Md.Code (1957, 1964 Repl.Vol.) Article 48A, § 480, *see supra,* and Md.Code (1957, 1965 Repl.Vol.) Article 43, § 556A, concerning tort immunity and hospitals.[6]

---

5. Where the non-charitable activity is not incidental to but largely separate from the charitable activity, the rule may be different. We do not have that situation here, and, therefore, we need not explore the matter further in this case.

6. The current incarnation of Md.Code (1957, 1965 Repl.Vol.) Article 43, § 556A is Md.Code (1982, 1990 Repl.Vol., 1993 Cum.Supp.) § 19–354 of the Health–General Article.

The Court determined that the rule of *Perry,* 63 Md. 20, stood, "tempered only by statutory provisions directed to the insurer. . . ." *Howard,* 249 Md. at 236, 238 A.2d 863. It reached "the inescapable conclusion" that

> both imposition and abrogation of the immunity doctrine are products of specific circumstances. There is no universal sentiment charging charitable tort immunity to be unconscionable, a state subsidy to religious organizations or a deprivation of equal protection of the laws. Where states have chopped away at the doctrine, it has mostly been by processes of attrition and piecemeal adjudication, often accompanied by legislation amending the state insurance code.

*Id.* at 241, 238 A.2d 863. The Court again restated its opinion that

> the General Assembly has completely investigated the immunity question, and the present statutes are tangible evidence that the Legislature arrived at a solution which it deemed satisfactory.

*Id.* at 241–242, 238 A.2d 863.

In *Wood v. Abell,* 268 Md. 214, 300 A.2d 665 (1973), we recognized that the doctrine of charitable immunity "remains alive and reasonably well in Maryland," despite its fall into disfavor elsewhere in this country. *Id.* at 240–241, 300 A.2d 665. We refused, in *Wood,* to extend the doctrine to a negligent employee of a charitable organization, because holding an employee personally liable would not invade the trust funds of a charity. *Id.* at 242–243, 300 A.2d 665. *Accord, James v. Prince George's County,* 288 Md. 315, 336–337, 418 A.2d 1173 (1980). We have not found a Maryland legislative enactment or a case of this Court decided since 7 March 1968, the date on which *Howard* was decided, that gives cause to depart from the *Howard* holding. The short of it is that the doctrine of immunity of charitable organizations is well settled in Maryland. Inasmuch as the Legislature has become extensively involved, any abrogation of the rule should be by

legislative rather than judicial action.[7]

Since *Wood*, the Legislature continued regularly to entertain bills on the subject of charities and charitable immunity, yet it has chosen not to abrogate the doctrine. In 1986 the Legislature granted to agents of charitable organizations, including employees, immunity for negligence[8] with certain provisos including specified insurance coverage. Md.Code (1974, 1989 Repl.Vol., 1993 Cum.Supp.) § 5–312 of the Courts and Judicial Proceedings Article (CJ). The following year immunity was extended to volunteers. CJ § 5–314. Thus, it is obvious that the Legislature continues to consider the issue of immunity for charities and those who work on their behalf. Our lawmakers have yet to declare that the doctrine of charitable immunity no longer has a place in our society. Indeed, they continue to legislate within the context of charitable immunity as it now exists.

Our answer today, in response to the contention that a judicially created rule of law based on public policy may be judicially repealed, is found in *Watkins v. Southcrest Baptist Church*, 399 S.W.2d 530, 533 (Tex.1966), which we quoted in *Howard*, 249 Md. at 242, 238 A.2d 863, with complete approval:

> "The principle of vicarious liability based upon the rule of respondeat superior is essentially a public policy doctrine. * * *. [We might very well substitute the trust fund theory for *respondeat superior*.] Courts have applied the rule to certain factual situations and refused to apply it to others. When the application of the doctrine has been

---

7.  In *Boblitz v. Boblitz*, 296 Md. 242, 462 A.2d 506 (1983) we abrogated the doctrine of interspousal immunity, but the Legislature had not become involved with that doctrine as such.

 In *Frye v. Frye*, 305 Md. 542, 505 A.2d 826 (1986), we refused to abrogate the doctrine of parent-child immunity in general or with respect to motor torts, as to which the Legislature had spoken, although not in terms of the doctrine.

8.  An agent who acts with "malice or gross negligence" is not protected from personal liability. Md.Code (1974, 1989 Repl.Vol., 1993 Cum. Supp.) § 5–312(d) of the Courts and Judicial Proceedings Article.

determined by court decisions, a change in application may be judicially effected. The situation is not the same as a judicial repeal of a statute for example. However, there is a case for a legislative rather than a judicial change of court created policy rules. Statutes effecting policy changes operate prospectively and are generally adopted following a period of deliberation accompanied by a sufficient and practical notice to all those who might be affected thereby. In fixing classifications of charitable institutions (for example) such as churches, hospitals, schools, etc. and prescribing limits of liability, the legislative power is much more flexible and amenable to particular needs and detailed requirements than is the judicial process."

Since 1885 we have left the abrogation *vel non* of the charitable immunity doctrine in the hands of the Legislature; we continue to do so.

We hold that the Circuit Court for Montgomery County did not err in granting the JCC's Motion to Dismiss.

***JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED;***

***COSTS TO BE PAID BY APPELLANT.***