907 A.2d 910

**Carlton Edward BOWSER**

v.

**Josephine I. RESH, et al.**

**No. 1378, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Sept. 20, 2006.

616

---

Micholas J. Monteleone (Hidey, Coyle & Monteleone on the brief), Cumberland, for Appellant.

Nathaniel B. Smith (Edgar Synder & Associates on the brief), Altoona, for Appellee.

Panel: MURPHY, C.J., SALMON and ROBERT L. KARWACKI (Ret., Specially Assigned), JJ.

SALMON, Judge.

This case has its origin in an accident that occurred on a two-lane highway in Garrett County, Maryland, on November 11, 1999, at approximately 5:50 p.m. One of the vehicles involved in the accident was a 1994 Dodge van driven by Francis Resh ("Mr. Resh"). At the time of the accident, the front-seat passenger in the van was Howard Dillsworth; the backseat passenger was Mr. Resh's wife, Josephine Resh, who is also the daughter of Mr. Dillsworth.

The accident happened when the van driven by Mr. Resh struck a skidloader (also referred to in the testimony as a "Bobcat") operated by Carlton Bowser. Mr. Resh was only slightly injured in the accident, but his wife, Mr. Dillsworth, and Mr. Bowser all suffered more serious injuries.

Approximately four months after the accident, Mr. Dillsworth died. Thereafter, Josephine Resh was appointed as the personal representative of his estate.

On February 14, 2002, Mrs. Resh, individually, filed a negligence suit against Mr. Bowser in the Circuit Court for Garrett County. She alleged that the November 11, 1999, accident was the exclusive fault of Mr. Bowser. Included in the complaint was a count alleging loss of consortium, which was brought by Mr. and Mrs. Resh jointly. Additionally, Mrs. Resh, as personal representative of her father's estate,

brought a survivorship action and, in her individual capacity, a wrongful death claim against Mr. Bowser.[1] Mr. Bowser filed an answer to the complaint, along with a counterclaim. He named as counter-defendants Mr. and Mrs. Resh, individually, and Mrs. Resh, in her capacity as personal representative of the estate of Mr. Dillsworth. In the counter claim, Mr. Bowser asserted that Mr. Resh's negligence caused the accident, and his negligence was imputable to both Mr. Dillsworth and Mrs. Resh, because at the time of the accident Mr. Resh was acting as the agent for both. Counter-claimant also contended that Josephine Resh was liable for her husband's negligence due to the fact that she was the owner of the van. In addition to seeking damages for his personal injury, Mr. Bowser asked for contribution and/or indemnity for all claims made by the plaintiffs in the original action.

Mr. Bowser later settled with the Reshes' insurer his claim for personal injury arising out of the accident. In connection with that settlement, Mr. Bowser signed, on September 29, 2003, a release. Subsequently, a stipulation of dismissal was filed as to Mr. Bowser's bodily injury claim.

On January 14, 2005, Mr. Bowser filed an amended counterclaim for indemnity and/or contribution. In addition to the allegations set forth in the original counterclaim, Mr. Bowser alleged in the amended counterclaim that Mrs. Resh negligently entrusted the operation of her vehicle to her husband and that her negligence in doing so, combined with the negligence of Mr. Resh, caused or contributed to the accident. He also alleged that Mrs. Resh was the agent and/or "employee" of Mr. Dillsworth at the time of the accident and that her own negligence in entrusting the Dodge van to her husband was imputable to Mr. Dillsworth.

On May 27, 2005, which was almost a year and one-half after the release was signed, Mr. and Mrs. Resh filed what they called a "Motion to Dismiss Carlton Bowser's Counter–

---

1. An amended complaint was filed in June 2002, but there were no changes in that complaint that are material to any issue raised in this appeal.

Claim for Indemnification and/or Contribution." Despite the title of the motion, it was, in legal effect, a motion for summary judgment as to all claims made in the counterclaim because it relied upon a document not attached to Mr. Bowser's counterclaim, i.e., the release signed on September 29, 2003. The release was relied upon by the Reshes, despite the fact that neither of them had specifically pleaded that defense as they were required to do pursuant to Maryland Rule 2–323(g)(12).

On June 20, 2005, the trial judge granted the Reshes' motion to dismiss the counterclaim for indemnification and/or contribution. Three days after the counterclaim was dismissed, on June 23, 2005, a jury trial commenced. The parties stipulated at trial that the jury would be required only to answer questions concerning liability.

The jurors were asked to answer six questions on a special verdict sheet. The questions propounded, and the jurors' answers to those questions, were as follows:

1. Do you find that Carlton E. Bowser, Jr., was negligent and that his negligence was a proximate cause of the accident on November 11, 1999?

 __✓__ Yes ____ No

2. Do you find that Francis Resh was negligent and that his negligence was a cause of the accident on November 11, 1999?

 __✓__ Yes ____ No

3. Do you find that Francis Resh was the agent of Josephine I. Resh?

 ____ Yes __✓__ No

4. Do you find that Francis Resh was the agent or employee of Elmer Dillsworth?

 ____ Yes __✓__ No

5. Do you find Josephine I. Resh was the agent of Elmer Dillsworth?

 ____ Yes __✓__ No

6. Do you find that Josephine I. Resh was the sole owner and an occupant of the Resh vehicle such that she had the *right* to control the operation of her vehicle even though she was not actually driving it?

_____ Yes ___√___ No

Mr. Bowser filed a motion for judgment notwithstanding the verdict and/or a new trial, which was denied. He then filed this appeal[2] in which he raises seven questions, viz.:

1. Did the trial court err when it denied Bowser's motion for partial judgment concerning the issues of agency and imputed negligence?

2. Did the lower court err when it denied Bowser's motion for partial summary judgment concerning the issues of agency and imputed negligence?

3. Did the trial judge err when he refused to instruct the jury concerning the issue of negligent entrustment?

4. Did the trial court err when it refused to instruct the jury concerning the defense of assumption of risk?

5. Did the lower court err when it dismissed Bowser's counterclaim for indemnification and/or contribution?

6. Did the trial court err when it referred to injuries while instructing the jury and thereby invit[e] the jury to consider injuries contrary to the court's prior *in limine* ruling that the jury was not to consider injuries?

7. Did the trial court err when it denied Bowser's motion for judgment notwithstanding the verdict and/or for new trial?

---

**2.** After the appeal was filed, the parties stipulated as follows:
STIPULATION AND AGREEMENT
The parties, by counsel, hereby confirm and memorialize their agreement, previously referred to in the record, and acknowledged by the June 3, 2005 order of the Honorable James S. Sherbin, that this case was to be and was tried, on issues pertaining to liability only, the parties previously having resolved all issues of damages by agreement.
Accordingly, the parties also stipulate and agree that the appeal noted by Defendant Bowser in these proceedings is an appeal from a final judgment.

## I. FACTS DEVELOPED AT TRIAL

### A. The Happening of the Accident

The subject accident occurred on Underwood Road near Mr. Bowser's residence in Garrett County. At the time of the accident, Mr. Resh was driving with his low-beam headlights on, and it was either dark (Mr. Bowser's testimony) or "getting dark" (Mr. Resh's testimony). Underwood Road is a two-lane highway, and the Reshes' vehicle was proceeding southbound in the right lane of that road.

Mr. Resh, who was sixty years old at the time of the accident, was very familiar with Underwood Road, having driven it regularly for many years. About 300 feet north of the scene of the accident, the 1994 van driven by Mr. Resh passed Mr. Bowser's farmhouse.

Meanwhile, on the evening of the accident, Mr. Bowser, aged sixty-nine, had used his skidloader to carry a load of firewood to his house. After dumping the firewood, Mr. Bowser drove to the end of his driveway, looked north on Underwood Road, saw no oncoming vehicles, and proceeded to turn right onto the roadway. He then proceeded southbound on Underwood Road at a speed of no greater than six miles per hour. He intended to travel southbound for about 300 feet, then to turn right and park the skidloader in his barn.

Mr. Bowser ordinarily did not drive the skidloader on public roads at night, and the vehicle was not licensed to be operated on public roadways. There were no taillights or reflectors on the skidloader, nor was the vehicle equipped with the required "Slow Moving Vehicle" emblem on the rear. The vehicle was, however, equipped with two white halogen lights on the front and one on the rear. The three lights were activated at all times here relevant.

A short distance past Mr. Bowser's house, Mr. Resh saw the skidloader in the roadway, hit his brakes, and swerved, but the van, nevertheless, collided with the much slower moving vehicle. Immediately before impact, but after Mr. Resh had

seen the skidloader, Mrs. Resh hollered from the backseat, "Watch out."

**B.** *Testimony Regarding Ownership of the 1994 Van*

At the time of the accident, the Reshes had been married for approximately thirty-seven years. The 1994 van was titled in Mrs. Resh's name alone. In regard to the ownership of the vehicle, Mrs. Resh's testimony was as follows:

Q [ATTORNEY FOR THE RESHES]: The van that was being—that was owned by you and your husband, leading up to November 11, 1999, do you know whose name that van was titled in?

A: Yes, my name, Josephine Resh.

Q: Okay. Do you know why that van was placed in your name?

A: Well, yes, because I went and got it, and it was my, you know, our vehicle, but I went and got it in my name.

Q: Okay. Was there any particular reason why your husband's name wasn't placed on that vehicle?

A: No. Because everything is 50/50. We just—it's his and it's mine.

Q: Okay. So how did you consider that van in terms of ownership, from your perspective?

A: Well, it was in my name, but I never thought about that; didn't amount to—the name didn't amount to nothing, because we share everything, always did that, 50/50. It's not mine; it's not his.

Q: Did you ever attempt to control or attempt to assert control in regard to the usage of that van?

A: No, I never, never did.

(Defense counsel did not cross-examine Mrs. Resh on this or any other subject.)

Mr. Resh testified:

Q [ATTORNEY FOR THE RESHES]: Let me ask you a few questions about the vehicle that you were driving. What kind of vehicle was it?

A: It was a '94 Dodge Van, multi-van.

Q: Whose vehicle was that?

A: Well, when we buy a car we—everything's 50/50. So, I don't know if I had her name on it or if she had my name on it for sure, but the insurance company—both of our names is on the insurance.

Q: Well, I'm not asking about that. I'm asking about, um, if it would be shown, through evidence, that the vehicle was titled in your wife's name?

A: It could have. Yes.

Q: Okay. Would—at the time of the accident, did you know that to be the case?

A: No, I didn't.

Q: Okay. And how was that vehicle used in terms of, you know, how it may have been shared between you and your wife?

A: When she wanted it, she drove it, and when I wanted it, I drove it.

Q: When you wanted it, would you have to ask her for permission to use it?

A: No.

Q: When you were driving together, who would drive?

A: I drove most of the time, and sometimes she would drive.

### C. *Evidence Concerning Agency*

On November 11, 1999, Mr. Resh, accompanied by his wife, drove Mr. Dillsworth to a hospital in Cumberland, where Mr. Dillsworth underwent out-patient surgery for colon cancer. The threesome then left the hospital and headed toward Accident, Maryland, where the Reshes lived. On the way home, they stopped at a fast food restaurant in LaVale, Maryland, to get some food. Mr. Resh then drove to his home so that he could pick up some insulin that he needed for his diabetes and also so that he could pick up a blanket and pillow for his wife.

After about a fifteen-minute layover, the Reshes and Mr. Dillsworth then got back in the van with the intent of driving to Mr. Dillsworth's home and staying overnight. The Reshes planned to leave from Mr. Dillsworth's home the next morning and to take Mr. Dillsworth to his doctor's office for a post-surgery consultation. While driving to Mr. Dillsworth's home, Mr. Resh stopped at a drugstore so that his wife could purchase some medication that Mr. Dillsworth needed. Their trip then resumed, but a short time later the Resh vehicle was involved in the accident with Mr. Bowser.

### D. *Mr. Resh's Health and Driving History*

Prior to the accident, Mr. Resh had suffered from diabetes for about thirty years. He was insulin dependent and was required to take insulin once every morning and once every evening.

Prior to the accident, Mr. Resh had experienced bleeding behind the eyes (diabetic retinopathy), and he had undergone several surgeries to deal with that problem. His regular ophthalmologist, at all times here pertinent, was Dr. Steven Powell. Dr. Powell's medical records, which were admitted into evidence, showed the following:

- March 27, 1995: Dr. Powell noted that Mr. Resh was a diabetic, that at times his sugar levels exceeded 500, that he experienced burning and watering of his eyes and, during a period of two to three years, had difficulty holding his eyes open.

- May 24, 1995: Mr. Resh previously had cataracts removed but wondered why he still could not see better. Dr. Powell explained that the problem was caused by diabetes.

- February 2, 1996: Mr. Resh complained that objects seemed smaller and brighter.

- August 27, 1996: Mr. Resh complained that his vision was getting blurry and that images looked smaller.

- May 9, 1997: Mr. Resh complained that his vision gets foggy.

- August 22, 1997: Mr. Resh complained that his vision was getting dimmer.
- December 12, 1997: In Dr. Powell's notes, under the heading "Diagnostic or Treatment Plan/Options," the words "avoid night driving" appear. Also, an examining physician at Sacred Heart Hospital felt that the blood vessels in Mr. Resh's eyes were bleeding and that they needed to be checked right away.
- February 13, 1998: A note says: "C/O [complains of] VA [visual acuity] not very good."
- September 25, 1998: Mr. Resh's visual acuity continued to fluctuate.
- August 24, 1999: Mr. Resh continued to complain of watering and burning in his eyes. His visual acuity continued to fluctuate.
- September 28, 1999: Mr. Resh complained to Dr. Powell that he could not make things out at a distance during a period of two or three years and that this had gotten worse lately. His vision was tested and was recorded as 20/60 in one eye and 20/80 in the other.

At the time of Mr. Resh's admission to Garrett County Memorial Hospital shortly after being struck with an air bag in the subject accident, a physical assessment indicated that he complained of blurred vision. While at the hospital, he was given his second dose of insulin for that day.

Mr. Resh testified that most of the information in his chart was given to Dr. Powell's secretary. He recalled that when he did complain to Dr. Powell about blurriness he was referring to blurry vision when he looked at "real fine measurements on a rule[r]." He acknowledged that in August of 1997 he told Dr. Powell that "his vision was getting dimmer," but then Dr. Powell changed the prescription for his glasses and his vision improved. Mr. Resh further testified that his vision would fluctuate with his blood sugar. When his blood sugar "was up," he "could see," but when it went too low, his vision would become blurry. He also admitted telling Dr. Powell that he could not see things at a distance and that the problem was

worse lately; he said, however, that he was referring to his inability to "read a rule[r]." He testified that he could clearly see things at a distance, such as birds on a power line, which he could see at a distance of three—or four-hundred feet.

In regard to the evening of the accident, Mr. Resh testified that he was experiencing no vision problems. He said that, immediately after the air bag was deployed upon impact of the van with the skidloader, he was gasping for air and might have been knocked unconscious. He also said that being struck by the air bag might have caused his blurry vision.

Mr. Resh had been, at the time of the accident, a licensed driver in Maryland for over thirty-five years. He had no restrictions on his license and denied he had never been advised by Dr. Powell to avoid driving at night.

Mrs. Resh acknowledged that she accompanied her husband during his visits to Dr. Powell's office. She also went into the examining room with her husband and was present during all discussions between Dr. Powell and her husband. She testified that Dr. Powell had never told her husband to avoid night driving. Mrs. Resh also testified that her husband frequently drove at night and that, prior to the subject accident, he had never been involved in any other vehicular accidents. Moreover, his Maryland license had never been suspended or revoked.

Dr. Thomas R. Friberg, a board certified ophthalmologist, testified on behalf of Mr. Bowser. He reviewed deposition testimony of Mr. Resh, along with Mr. Resh's medical records. He testified, to a reasonable degree of medical certainty, that Mr. Resh suffered from diabetic retinopathy, which affects visual acuity, the ability to observe objects at a distance, the ability to perceive light, as well as the ability to see at night. In his opinion, but for the existence of Mr. Resh's visual impairment, he would have been able to see the Bowser vehicle in sufficient time to avoid the accident. According to Dr. Friberg's testimony, Mr. Resh's vision, at the time of accident, with glasses, was 20/60 in one eye and 20/80 in the other.

## II. ANALYSIS

### First Issue Presented

Mr. Bowser contends that the trial court erred when, after all the evidence had been presented, it denied his motion for partial judgment on the issues of agency and imputed negligence. In this regard, he claims: (1) Mr. Resh's negligence should, as a matter of law, have been imputed to Mrs. Resh; (2) Mr. Resh, as a matter of law, was the agent of Mrs. Resh; (3) Mr. Resh, as a matter of law, was the agent of Mr. Dillsworth; and (4) Mrs. Resh was also the agent of Mr. Dillsworth and therefore her imputed negligence should be attributed to Mr. Dillsworth.

### A. Imputed Negligence

In *Mackey v. Dorsey,* 104 Md.App. 250, 262–63, 655 A.2d 1333 (1995), Judge Alpert, speaking for this Court, said:

> Appellants ... rely on the theory, not entirely different from their agency theory, that Cooper's negligence may be imputed to Dorsey. In a leading case on imputed negligence, *Smith v. Branscome,* 251 Md. 582, 595, 248 A.2d 455 ... (1968), the Court of Appeals summarized this theory as follows:
>
> > [U]nder Maryland tort law, an owner because of his presumed control over his car when present though not physically handling the wheel, may be held liable in the event of a collision, to the same extent as if he were manually controlling or operating the vehicle. In such a case the negligence of the driver is said to be imputed to the owner. However, an agency relationship is not necessary to be shown, for the failure of the owner, who is present, to exercise his presumed control makes him liable.
>
> (quoting *Gray v. Citizens Casualty Co.,* 286 F.2d 625, 627 (4th Cir.1960)) (citations omitted).

The driver's negligence is imputed to the owner on the basis that "the owner-passenger retains his right to control the movements of the vehicle." *Nationwide Mutual Ins.*

*Co. v. Stroh,* 314 Md. 176, 181, 550 A.2d 373 ... (1988). In *Powers v. State,* 178 Md. 23, 28, 11 A.2d 909 ... (1940), the Court stated:

It is well established that the owner of an automobile, who is riding in it while driven by another, is not relieved of responsibility because he is not personally at the wheel, when he tacitly assents to the manner in which it is driven.... If the car is negligently operated, it is presumed that the owner consented to the negligence.

(Footnote omitted.)

The Court of Appeals, in *Nationwide Mut. Ins. Co. v. Stroh,* 314 Md. 176, 550 A.2d 373 (1988), said:

[W]here an automobile owner-passenger grants permission to another to drive his car, and the permissive operator drives negligently, the owner has presumptively consented to the negligence, which becomes imputed to him. The imputation is made based upon the theory that the owner-passenger retains his right to control the movements of the vehicle. Conversely, rebuttal of the presumption of right to control precludes imputation of negligence.

*Id.* at 181, 550 A.2d 373.

In *Stroh,* the Court held that the negligence of the husband, as the driver and co-owner of the vehicle involved in the accident, could not be imputed to his wife, a co-owner/passenger, so as to bar the wife from recovering for injuries caused in a collision between the vehicle driven by her husband, and another driven by a third party. *Id.* at 182–85, 550 A.2d 373.

The *Stroh* Court explained its rationale as follows:

In *Pavlos v. Albuquerque,* 82 N.M. 759, 487 P.2d 187, 193 (1971), the New Mexico Court of Appeals drew a pertinent distinction between the sole-owner and co-owner situations:

Where a non-owner is driving, and the owner is present in the car, a presumption exists that the driver is the agent of the owner. [Citation]. This presumption is based on the theory that the owner, present in the car, has the right to control the driver. [Citation]. *No such theory is applicable where one co-owner is driving and the other*

*co-owner is a passenger. It is inapplicable because the co-owners are equal in status and ownership; the co-ownership refutes agency.* [Citation]. Since, as between co-owners, presence is an insufficient basis for a presumption of agency, we do not reach the reality of a "right to control" a car speeding down the highway.

Finally, in *Kalechman v. Drew Auto. Rental, Inc.*, 33 N.Y.2d 397, 353 N.Y.S.2d 414, 416, 308 N.E.2d 886, 888 (1973), the New York Court of Appeals, before abandoning altogether the doctrine of imputed negligence, described the rule as follows: "The driver's negligence will be imputed to the passenger to defeat his action whenever the passenger has the exclusive authority to control the operation of the vehicle...." Significantly, the New York Court limited the doctrine to only those instances where the passenger has *exclusive* authority over the vehicle's operation. *In a co-owner situation, such as existed between Richard and Ellen Stroh, the passenger, at most, enjoys a non-exclusive, mutual authority to control the vehicle's operation, and consequently, application of the doctrine of imputed negligence is simply inapt.*

\* \* \*

Moreover, imputation of negligence to Ellen Stroh would not further the primary policy aim undergirding the doctrine of imputed negligence, namely, that of locating a "deep pocket" to provide recovery to an innocent victim of another's negligence. Instead, imputing Richard Stroh's negligence to his wife, as Nationwide beseeches us to do, the victim of the negligence of a third-party tortfeasor, would be unjustly barred from recovery. As the court stated in *LaMonte v. DeDiego*, 274 So.2d 254 (Fla.App.1973): "it is important to distinguish cases in which the *liability* of an owner or co-owner is in issue from those in which that owner seeks *recovery* from a negligent party." (Emphasis in original).

*Id.* at 183–85, 550 A.2d 373 (emphasis added).

■ The question then becomes was there evidence from which a rational jury could find that the 1994 van driven by

Mr. Resh was co-owned by Mr. and Mrs. Resh. If that question is answered in the affirmative, Mr. Bowser's motion for judgment as to imputed negligence should have been denied based on *Stroh* because there can be no imputed negligence between co-owners.

It is true, of course, that the undisputed evidence was that the 1994 van was titled in Mrs. Resh's name alone. But this fact is not determinative as to ownership. As the Court of Appeals said in *Liberty Mut. Ins. Co. v. Am. Auto. Ins.*, 220 Md. 497, 154 A.2d 826 (1959):

> This Court, and a majority of those of other jurisdictions, have rejected [the contention made by Liberty Mutual] by holding that title registration merely raises a presumption of ownership, which, not being conclusive, is rebuttable by evidence to the contrary if such is produced. It is, therefore, clearly a question for the trier of the facts to decide.

*Id.* at 500, 154 A.2d 826 (citations omitted).

In the case *sub judice*, there was testimony, if believed, that despite the registration of the vehicle, Mr. and Mrs. Resh were, in fact, joint owners. *See* testimony of Mr. and Mrs. Resh, reviewed in Part 1B, *supra.* Therefore, the trial judge did not err in denying Mr. Bowser's motion for partial judgment as to the issue of imputed negligence.[3]

---

**3.** Even if the appellees had failed to produce sufficient evidence to support a finding that the vehicle was jointly owned, the trial judge would still not have erred by denying Mr. Bowser's motion for partial judgment as to the issue of imputed negligence. The doctrine of imputed negligence is based on the presumption that the owner has a right to control the operator of a vehicle. *Nationwide v. Stroh,* 314 Md. at 181, 550 A.2d 373. That presumption is a rebuttable one. *Williams v. Wheeler,* 252 Md. 75, 85, 249 A.2d 104 (1969). Moreover, "the weight of the presumption is minimal, and while normally, it will be a jury question whether the owner has rebutted the presumption, in a proper case, the presumption may be rebutted as a matter of law." *Stroh,* 314 Md. at 181, 550 A.2d 373. Here, at a minimum, a jury issue was presented as to whether the presumption that Mrs. Resh had the right to control her husband had been rebutted. Taking the evidence in the light most favorable to the Reshes, the jury could have found that Mrs. Resh had relinquished her right to control the driver.

## B. *Agency*

The case of *Faith v. Keefer*, 127 Md.App. 706, 736 A.2d 422 (1999), is dispositive on the agency issue. Timothy Keefer was involved in an accident when driving a motor vehicle co-owned by Rebecca and Henry Faith. *Id.* at 713, 736 A.2d 422. Keefer drove the motor vehicle off the roadway and struck a utility pole, killing his passenger, Rebecca Faith ("Mrs. Faith"). *Id.* In *Faith,* Judge Hollander, speaking for this Court, said:

> Appellants [including Mrs. Faith's husband] contend that, even if the Answers [to Interrogatories] were properly considered, the lower court erred in granting summary judgment based on principles of agency, because the evidence was not sufficient to establish, as a matter of law, a principal-agent relationship between Rebecca and Keefer. Appellants essentially claim that the trial court erred because it based its decision on appellee's self-serving, uncorroborated assertion in the Answers that, when he and the decedent "were leaving Shoenagles [she] took the keys to her vehicle, threw them on the ground and told [appellee], 'You drive, you're driving home.'" Appellants maintain that there was no evidence from which the court could infer that Rebecca retained direction, supervision, and control over Keefer to establish an agency relationship as a matter of law.

> Relying on *Slutter v. Homer,* 244 Md. 131, 139, 223 A.2d 141 ... (1966), appellee [Keefer] posits that an agency relationship existed, as a matter of law, which defeated appellants' claims. In determining whether an agency theory applies, Keefer urges us to consider "the relationship of the parties and the nature of the expedition during which the accident occurred." *Appellee points to the undisputed facts that Rebecca owned the vehicle and he was driving them to the boarding house* [where Rebecca and appellee lived].

> "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and

consent by the other so to act." Restatement (Second) of Agency § 1 (1958). In *Green v. H & R Block, Inc.*, 355 Md. 488, 735 A.2d 1039 ... (1999), the Court recognized that "[t]he creation of an agency relationship ultimately turns on the parties' intentions as manifested by their agreements or actions." *Green*, 355 Md. at 503, 735 A.2d 1039.... Although an agency relationship "can be created [either] by express agreement or by inference from the acts of the agent and principal," *id.*, there are several factors that are relevant to determine the existence of such a relationship. *Id.*, at 503–04, 735 A.2d 1039.... *These include the agent's power to alter the legal relations of the principal, the agent's duty to act primarily for the benefit of the principal, and the principal's right to control the agent. Id.; see also United Capitol Ins. v. Kapiloff,* 155 F.3d 488, 498 (4th Cir.1998); *Schear v. Motel Management Corp.,* 61 Md.App. 670, 687, 487 A.2d 1240 ... (1985); Restatement (Second) of Agency §§ 12–14 (1958). These factors, however, are "neither exclusive nor conclusive considerations in determining the existence of an agency relationship." *Green*, 355 Md. at 506, 735 A.2d 1039....

In *Mackey v. Dorsey,* 104 Md.App. 250, 260, 655 A.2d 1333 ... (1995), we said: "[U]nder Maryland law there is a presumption that 'the negligent operator of a vehicle is the agent, servant, or employee of the owner acting within the scope of his employment.' This presumption is a rebuttable one, however ...." (quoting *Williams v. Wheeler,* 252 Md. 75, 82, 249 A.2d 104 ... (1969)) (citations omitted). *See also Toscano v. Spriggs,* 343 Md. 320, 325, 681 A.2d 61 ... (1996); *Rogers v. Frush,* 257 Md. 233, 244, 262 A.2d 549 ... (1970); *Campfield v. Crowther,* 252 Md. 88, 97, 249 A.2d 168 ... (1969); *House v. Jerosimich,* 246 Md. 747, 750, 230 A.2d 282 ... (1967); *Phillips v. Cook,* 239 Md. 215, 222, 210 A.2d 743 ... (1965); *State ex rel. Shipley v. Walker,* 230 Md. 133, 137, 186 A.2d 472 ... (1962); *Hoerr v. Hanline,* 219 Md. 413, 419–20, 149 A.2d 378 ... (1959).

Of particular relevance here, the Court in *Green* emphasized that, ordinarily, "the question of the existence of the

agency relationship is a factual matter and *must* be submitted to the jury." *Green,* 355 Md. at 504, 735 A.2d 1039 . . . (emphasis added); *P. Flanigan & Sons v. Childs,* 251 Md. 646, 653, 248 A.2d 473 . . . (1968). *Accordingly, even assuming that appellee presented legally sufficient evidence of an agency relationship, whether an agency relationship was actually created "is a factual matter and must be submitted to the jury."* *Green,* 355 Md. at 527, 735 A.2d 1039. . . . On this basis, we are satisfied that summary judgment was not warranted.

*Id.* at 738–40, 736 A.2d 422 (emphasis added).

■ In the case *sub judice,* there clearly was a jury issue presented as to whether Mr. Resh was acting as Mrs. Resh's agent. It was far from clear whether Mrs. Resh had a right to control her husband's actions on the night of the accident or whether Mr. Resh had a duty to act primarily for Mrs. Resh's benefit. Under such circumstances, "whether an agency relationship was actually created" between Mr. and Mrs. Resh was a "factual matter . . . [that] must be submitted to the jury." *Faith, supra,* 127 Md.App. at 740, 736 A.2d 422.

■ In the case at hand, Mr. Bowser argues that, based on the undisputed facts presented at trial, the jury could not have appropriately found that the presumption of agency had been rebutted. According to appellant, Mr. Resh was operating Mrs. Resh's vehicle in the course of transporting Mrs. Resh and her father "to the hospital for pre-arranged medical care." This last statement is untrue. At the time of the accident, Mr. Resh was driving the van to his father-in-law's house where he and his wife and Mr. Dillsworth planned to stay the night.

Appellant continues: "Josephine I. Resh was benefited by Francis E. Resh's operation of the Resh vehicle as it freed [Mrs. Resh] to attend to her father's needs during the trip." At trial, there was no testimony that the reason Mr. Resh drove was to allow Mrs. Resh to give medical care to her father. In fact, there was no testimony that Mrs. Resh did render medical care to her father during the trip in question,

i.e., the trip from the Resh's home in Accident, Maryland, to the scene of the accident.

Appellant also claims that Mrs. Resh's "deposition testimony made it clear that she was in charge of the trip and that [Mr. Resh] could only have been acting for her benefit and for the benefit of [Mr. Dillsworth]." The deposition testimony that was read into evidence at trial simply does not support the foregoing assertion.

Appellant also contends that his motion for partial judgment should have been granted as to his claim that Mr. Resh was acting, at the time of the accident, as the agent of Mr. Dillsworth "within the scope of his agency." According to appellant,

[a]ll aspects of the trip from Garrett County to Sacred Heart Hospital, from Sacred Heart Hospital to the [place where they stopped to eat], from [the place where they stopped to eat] to the Dill[s]worth home, from the Dill[s]worth home to the [drugstore where medicine was purchased], and from [the drugstore] back to the Dill[s]worth home were undertaken for the benefit of [Mr. Dillsworth] . . . as well as for the benefit of [Mrs. Resh].

There was no evidence that the trip was taken for the benefit of Mrs. Resh. The trip did benefit Mr. Dillsworth, but that fact, standing alone, does not necessarily show that an agency relationship existed between Mr. Dillsworth and the driver of the vehicle because the evidence was, at a minimum, unclear as to whether Mr. Resh ever consented to a principal-agency relationship with his father-in-law. *See Green v. H & R Block,* 355 Md. 488, 506, 735 A.2d 1039 (1999) (for an agency relationship to exist, it must be shown that both the principal and agent consented to the establishment of such a relationship).

Here, taking the evidence in the light most favorable to the plaintiffs, Mr. Dillsworth did not have a right to control his son-in-law, nor did he ever even attempt to exercise such a right, and Mr. Dillsworth never assented to establishment of such a relationship. The same can be said as to appellant's

contention that, as a matter of law, Mrs. Resh was the agent of her father, Mr. Dillsworth. Taking the evidence in the light most favorable to the appellees, the evidence supported a finding that Mrs. Resh and her husband, at the time of the accident, were simply helping out a sick relative, and none of the plaintiffs consented to the establishment of a principal-agent relationship. Therefore, the trial judge did not err in denying appellant's motion for partial judgment as to any of the agency or imputed negligence theories put forth by appellant.

## III.

Appellant contends that the motions court erred when, prior to trial, it denied his motion for partial summary judgment on the issues of agency and imputed negligence.

In *Metropolitan Mortgage Fund, Inc. v. Basiliko*, 288 Md. 25, 29, 415 A.2d 582 (1980), the Court held:

[W]e now hold that a denial (as distinguished from a grant) of a summary judgment motion, as well as foregoing the ruling on such a motion either temporarily until later in the proceedings or for resolution by trial of the general issue, involves not only pure legal questions but also an exercise of discretion as to whether the decision should be postponed until it can be supported by a complete factual record; and we further hold that on appeal, absent clear abuse . . . , the manner in which this discretion is exercised will not be disturbed.

More recently in *Mathis v. Hargrove*, 166 Md.App. 286, 304, 888 A.2d 377 (2005), Judge Davis, speaking for this Court, said that "ordinarily no party is entitled to summary judgment as a matter of law." The only exception to this rule is if the motion for summary judgment is based on a pure issue of law such as the expiration of the statute of limitation. *Id.*

When the court, prior to trial, denied appellant's motion for summary judgment, it was not presented with a pure question of law. Therefore, based on the legal principles set forth in

*Metropolitan Mortgage* and *Mathis*, the circuit court did not commit reversible error when it denied appellant's motion for partial summary judgment.

## IV. *ISSUE 3*

■ Despite the fact that the uncontradicted testimony in this case showed that Mr. Resh was a licensed driver at the time of the accident and had no restrictions on his driver's license, Mr. Bowser contends that a jury question was presented as to whether Mrs. Resh negligently entrusted the 1994 Dodge van to Mr. Resh. According to appellant, the evidence introduced at trial

> was sufficient to support a jury verdict that [Mrs. Resh] knew, or in the exercise of reasonable care should have known, that her husband's ability to safely operate a motor vehicle was significantly compromised and that she nevertheless permitted him to operate the vehicle which was titled in her name.

Appellant's argument that Mrs. Resh knew that Mr. Resh's abilities were "significantly compromised" is based on the evidence summarized above concerning Mr. Resh's eyesight.

Negligent entrustment is simply another way of imposing vicarious liability. To prove that the van was negligently entrusted to Mr. Resh, appellant was required to prove that the entrustor (Mrs. Resh) knew, or reasonably should have known, prior to the accident, that Mr. Resh could not see well enough to drive safely at night. The uncontradicted testimony of both Mr. and Mrs. Resh was that Mr. Resh drove frequently at night, that there was no restriction on his Maryland driver's license, that no doctor ever told either Mr. or Mrs. Resh that Mr. Resh should avoid nighttime driving, and that prior to the subject accident Mr. Resh had never had a motor vehicle accident of any kind. Nothing in Mr. Resh's medical records introduced at trial rebutted any portion of that testimony.[4] Under such circumstances, we agree with the trial

---

**4.** Although there is a note in the medical records of Dr. Powell that says, tersely, "avoid night driving," there was no testimony from any

judge that appellant had failed to produce sufficient evidence to generate a jury issue as to negligent entrustment.

## V. *ISSUE 4*

■ Mr. Bowser argues that the trial judge erred in failing to submit to the jury the issue of whether Mrs. Resh assumed the risk of injury because she knew, or should have known, prior to the accident that because of Mr. Resh's vision problems he was unable to operate the vehicle safely at night. For the same reasons as we held that the trial judge did not err when he declined to allow the jury to consider the issue of negligent entrustment, we hold that the court did not err in failing to allow the jury to consider the defense of assumption of risk.

## VI. *ISSUE 5*

Mr. Bowser contends that the circuit court erred in dismissing his claim for indemnification and/or contribution that he filed against Mr. Resh, Mrs. Resh in her capacity as personal representative of the estate of Mr. Dillsworth, and Mrs. Resh individually. Because of the answers the jurors gave on their special verdict sheet, Mr. Bowser did not have a right to contribution against either Mrs. Resh individually or in her capacity as personal representative of Mr. Dillsworth's estate. Therefore, whether or not the court was in error in dismissing those last-mentioned claims is moot.

The jury did find, however, that Mr. Resh was negligent and that his negligence was a cause of the subject accident. Therefore, whether the trial judge erred in dismissing the counterclaim for indemnity and/or contribution against Mr. Resh must be decided.

The release signed by Mr. Bowser, when all nonessential verbage is excluded, provides that

witness that this advice was communicated to either Mr. or Mrs. Resh, nor does the wording of any entry in any of Mr. Resh's medical charts suggest that there was any such communication.

in consideration of the payment of $6,650.00 ... Bowser ... [has] released and discharged ... Francis E. Resh ... of and from any and all past, present and future ... causes of action, claims, demands, damages ... including claims for contribution and/or indemnity of whatever nature, ... resulting or to result from ... [the subject accident].

Mr. Resh's answer to the original counterclaim filed on June 19, 2002, did not plead release as a defense and for good reason: the release was executed about one hundred days *after* his original answer was filed. But subsequent to the release's being signed, Mr. Resh's counsel did not amend the answer he had filed previously. Moreover, when Mr. Bowser, on January 14, 2005, filed an amended counterclaim in which he once again asked for indemnification and/or contribution from Mr. Resh, the latter filed no answer to the amended counterclaim. Therefore, Mr. Resh's answer to the original counterclaim stood as his answer to the amended counterclaim. *See* Md. Rule 2–341(a).

Mr. Resh filed a motion to dismiss that was based on the wording of the release. Counsel for Mr. Bowser filed a motion to strike the motion to dismiss on the grounds, *inter alia,* that the defense was barred because Mr. Resh had never pleaded release as a defense as he was required to do.

Maryland Rule 2–323(g) reads:

**Affirmative defenses.** Whether proceeding under section (c) or section (d) of this Rule, a party shall set forth by separate defenses: (1) accord and satisfaction, (2) merger of a claim by arbitration into an award; (3) assumption of risk, (4) collateral estoppel as a defense to a claim, (5) contributory negligence, (6) duress, (7) estoppel, (8) fraud, (9) illegality, (10) laches, (11) payment, (12) *release,* (13) res judicata, (14) statute of frauds, (15) statute of limitations, (16) ultra vires, (17) usury, (18) waiver, (19) privilege, and (20) total or partial charitable immunity.

In addition, a party may include by separate defense any other matter constituting an avoidance or affirmative defense on legal or equitable grounds. When a party has

mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court shall treat the pleading as if there had been a proper designation, if justice so requires.

(Emphasis added.)

In a written opinion filed three days before trial was to commence, the trial judge denied Mr. Bowser's motion to strike and granted Mr. Resh's motion to dismiss the counter-claim. In doing so, the court said:

In his Motion to Strike, Defendant asserts that by Rule, Plaintiffs had 15 days to respond to the amended counter-claim. Md. Rule 2–341. The rule further states that if no new answer is filed, then the answer previously filed shall be treated as the answer to the amendment. Rule 2–322 governs the filing of a motion to dismiss and requires that mandatory defenses be raised prior to filing answer, if an answer is required. *Under the same rule, permissive defenses may be raised in any other appropriate manner after the answer is filed.*

Since Plaintiffs did not file an answer to the amended counterclaim, their answer to the original counterclaim is their response to the amendment. *The motion to dismiss is an appropriate manner to raise the defense of the release and stipulation of dismissal, particularly since there is no prejudice to Defendant.*

(Emphasis added.)

As can be seen, the reason the motions judge rejected Mr. Bowser's waiver argument was because the court believed that release was one of the permissive defenses that "may be raised in any other appropriate manner after the answer is filed." The motions judge misread Maryland Rule 2–322. Section (b) of Rule 2–322 reads:

**Permissive.** The following defenses may be made by motion to dismiss filed before the answer, if an answer is required: (1) lack of jurisdiction over the subject matter, (2) failure to state a claim upon which relief can be granted, (3) failure to join a party under Rule 2–211, (4) discharge in

bankruptcy, and (5) governmental immunity. If not so made, these defenses and objections may be made in the answer, or in any other appropriate manner after answer is filed.

Release is not one of the permissive defenses that may be made in "any other appropriate manner after [an] answer is filed." Rule 2–322(b) has no application to an affirmative defense such as release, which is governed by Maryland Rule 2–323(g).

In this Court and in the circuit court, Mr. Bowser relied on *Gooch v. Maryland Mech. Sys., Inc.,* 81 Md.App. 376, 567 A.2d 954 (1990), to support his contention that the defense of release was waived by the failure of Mr. Resh's counsel to plead it as a defense to the counterclaim. John B. Gooch sued Maryland Mechanical and others for libel. *Id.* at 379, 567 A.2d 954. In the trial court, summary judgment was granted in favor of the defendants. *Id.* at 383, 567 A.2d 954. On appeal, one of the issues raised was whether the defendants/appellees possessed a conditional privilege to write the letter that formed the basis for the libel suit. In *Gooch,* we held that it was unnecessary to answer that question because the defendants/appellees "waived the issue by failing to plead specially this affirmative defense in their answer." *Id.*

The *Gooch* Court said:

Privilege is an affirmative defense that is required to be set forth separately in the answer. *See* Md. Rule 2–323(g)(20) (1989). Appellees did not set forth any affirmative defenses in their answer. In fact, the first time conditional privilege was mentioned by the appellees was in their response to Request for Admissions Under Rule 2–424 dated September 26, 1988. *The defense was subsequently relied upon in their motion for summary judgment.* The appellees never attempted to amend their pleadings, pursuant to Rule 2–341, to include the affirmative defense of conditional privilege.

The appellees argue that they *could* have amended their answer under the liberal rules allowing amendment and,

further, that no sanction is provided for failing to include an affirmative defense in the answer. The fact that the appellees could have amended their complaint to include the defense is of no moment. *The requirement that affirmative defenses be set forth separately is not a mere nicety; it is designed to give notice to the plaintiff of the defenses asserted to his complaint. This rule prevents unfair surprise and enables a plaintiff to concentrate the focus of his discovery.* The fifteen days between the time a motion for summary judgment is filed and the time a response is required is simply insufficient to allow proper preparation for a defense not relied upon in the previous three years. For these reasons, this defense could not properly have been relied upon by the circuit court.

The fact that no "express sanction" is mentioned in the rules for such a failure to plead does not allow for a different result. In *Ocean Plaza Joint Venture v. Crouse Constr. Co.,* 62 Md.App. 435, 490 A.2d 252 ... (1985), *cert. granted,* 304 Md. 163, 497 A.2d 1163 ..., the appellee, an excavation subcontractor, filed a claim for a mechanics lien against property owned by the appellant. At trial, the appellant introduced two documents—a "General Release of Liens" and a "Waiver of Liens"—to which the appellees did not object. In its opinion and decree, the trial court established the lien in favor of the appellees, expressly refusing to consider any waiver of the lien. Noting that the appellant failed to assert the affirmative defense of waiver of lien in its answer, this court held:

The trial court correctly excluded the forms of evidence of appellee's waiver of its lien. *The forms could not be admitted for this purpose, because appellant's failure to plead specially the issue eliminated it from the case. Id.* at 451, 490 A.2d 252.... Only those defenses that are expressly set forth in Rule 2–324 (formerly Rule 323b) as being assertable at any time are non-waivable defenses. *Id.* at 445, 490 A.2d 252.... Thus, we hold that the failure of a defendant to include an affirmative defense in its original answer or a properly amended answer bars the defendant

from relying on the defense to obtain judgment in its favor. *See also* Niemeyer & Richards, *Maryland Rules Commentary*, ch. 300 at p. 154 (1984).

*Id.* at 384–86, 567 A.2d 954 (footnotes omitted).

Despite the fact that *Gooch* was relied upon by Bowser in his opening brief, Mr. Resh's brief does not attempt to distinguish *Gooch.* In fact, Mr. Resh's brief does not in any way attempt to address the correctness, *vel non,* of the motions judge's ruling that the defense of release had not been waived.

It is impossible to make any meaningful distinction between *Gooch* and this case. *Gooch* dealt with a motion for summary judgment filed on September 9, 1988, which was approximately three years after the original suit was filed; the summary judgment motion was granted on December 21, 1988. *Id.* at 379, 567 A.2d 954. We held in *Gooch* that fifteen days between the time a response to a motion for summary judgment was filed and the date a response was due was "insufficient to allow proper preparation for a defense not relied upon in the previous three years." *Id.* at 385, 567 A.2d 954. In the case *sub judice,* Mr. Resh's motion to dismiss, which should have been treated as a motion for summary judgment, was not filed until about twenty months after the release was signed.

The case of *Liberty Mut. Ins. Co. v. Ben Lewis Plumbing, Heating & Air Conditioning, Inc.,* 121 Md.App. 467, 710 A.2d 338 (1998), is also apposite. That appeal arose out of a suit by Liberty Mutual for breach of contract against its customer, Ben Lewis Heating & Air Conditioning, Inc. (hereafter "Lewis"). Lewis filed an answer to Liberty Mutual's complaint but did not assert the defense of negligent misrepresentation in its answer. *Id.* at 471, 710 A.2d 338. Liberty Mutual filed a motion for summary judgment on its breach of contract claim. *Id.* at 472, 710 A.2d 338. Lewis, in its response to the summary judgment motion, claimed that it was not liable to Liberty Mutual because of a negligent misrepresentation that had been made by one of Liberty Mutual's agents prior to the contract of insurance being executed. The motion for summary judgment was denied, and the trial court allowed the

jury to decide, *inter alia,* whether Liberty Mutual had made any relevant negligent misrepresentations. The jury found that Lewis had proven negligent misrepresentation by a preponderance of the evidence. Nevertheless, the jury awarded Liberty Mutual $63,725 on its breach-of-contract count. *Id.* A post-trial motion was filed by Lewis; the court granted the motion and struck the judgment in favor of Liberty Mutual because the jury had found that Liberty Mutual had made a negligent misrepresentation. *Id.*

On appeal, Liberty Mutual contended that the trial court had erred in striking the judgment in its favor because Lewis should not have been allowed to rely upon a defense (negligent misrepresentation) that was not specifically pleaded.

Judge Richard T. Rombo, specially assigned, and speaking for this Court, said:

> In this case, Lewis's Answer was a recitation of every defense listed in Rule 2–323 that might be applicable to a contract action. By pleading everything, the defendant informed the plaintiff of nothing. We shall here hold that Rule 2–323(a) means exactly what it says: "Every defense of law or fact to a claim for relief ... shall be asserted in an answer...." This interpretation will serve to carry out the general philosophy of the Court of Appeals with regard to pleadings. That is, appropriate notice must be given to the opposing party so as to comply with the requirements of due process.

*Id.* at 479, 710 A.2d 338.

In the *Lewis* case, Lewis argued, in the alternative, that it had complied with the requirements of Maryland Rule 2–323 because it raised the defense of negligent misrepresentation when it filed its response to Liberty Mutual's motion for summary judgment. *Id.* at 479, 710 A.2d 338. Lewis relied on *Abramson v. Reiss,* 334 Md. 193, 638 A.2d 743 (1994), in which the defendant did not file an answer to the plaintiff's complaint but instead filed a motion for summary judgment relying on the defense of charitable immunity, which is one of the twenty special defenses listed in Maryland Rule 3–323(g).

The *Abramson* Court said, *in dicta,* that "the defense of charitable immunity may be raised by a Motion for Summary Judgment. It also may be presented as an answer." 334 Md. at 195 n. 2, 638 A.2d 743.

In the *Liberty Mutual* case, we rejected Lewis's reliance upon the *Abramson* case and said:

Lewis's reliance is misplaced. First, *Abramson* was in a different procedural posture. In that case, the affirmative defense was advanced in a motion for summary judgment in response to a complaint, while Lewis's defense was raised as an answer to a motion for summary judgment when the case was already at issue. Second, the quoted statement from *Abramson* is clearly *dicta.* The precise question was not before the court in *Abramson.* Moreover, there is contrary *dicta* from the Court of Appeals in *Gilbert v. Washington Suburban Sanitary Commission,* 304 Md. 658, 500 A.2d 1039 . . . (1985). In that case Gilbert, a temporary employee of WSSC, sued the WSSC for negligence. The WSSC responded by moving to dismiss on the grounds that plaintiff's sole remedy was before the Worker's Compensation Commission. The trial court treated the motion to dismiss as a motion for summary judgment and granted it; the Court of Appeals ruled that there was an issue of fact as to whether Gilbert was an employee of WSSC and vacated the lower court's order. In its opinion, however, the Court wrote: "The question of workmen's compensation as an exclusive remedy should have been raised as an affirmative defense." 304 Md. at 661, 500 A.2d 1039. . . .

The Federal cases are instructive. The Federal courts hold that an affirmative defense may not be raised for the first time in a summary judgment motion. *In re Jackson Lockdown/MCO,* 568 F.Supp. 869, 886 (D.Mich.1983); *Local 149, Boot and Shoe Workers Union, AFL/CIO v. Faith Shoe Company,* 201 F.Supp. 234, 238 (D.Pa.1962). The Federal courts permit affirmative defenses to be raised for the first time on summary judgment when the motion is filed in response to the plaintiff's Complaint. *Livingston School District Nos. 4 & 1 v. Keenan,* 82 F.3d 912, 917 (9th

Cir.1996); *Williams v. Murdoch,* 320 F.2d 745, 749 (3rd Cir.1964 [C.A.D.C.1963]); *Katz v. Connecticut,* 307 F.Supp. 480, 483 (D.Conn.1969), aff'd. *per curiam,* 433 F.2d 878 (1970). Thus the Federal rule, which seems to be clearly established, is that an affirmative defense may be raised for the first time by summary judgment motion when that motion is the defendant's initial response to the plaintiff's complaint. *U.S. v. Burzynski Cancer Research Institute,* 819 F.2d 1301, 1307 (5th Cir.1987); *Funding Systems Leasing Corp. v. Pugh,* 530 F.2d 91, 96 (5th Cir.1976).

On the facts presented by this case, we hold that asserting a defense for the first time in response to a motion for summary judgment, when the case is at issue, does not satisfy the requirements of Rule 2–323 . . . .

*Liberty Mutual,* 121 Md.App. at 480–81, 710 A.2d 338.

Because of Lewis's failure to specifically plead negligent misrepresentation, we reversed and reinstated the judgment that previously had been entered in favor of Liberty Mutual. *Id.* at 481, 710 A.2d 338.

▮ In the case at hand, the motion to dismiss filed by the Reshes should have been treated as a motion for summary judgment because the movants relied upon the release, which was a "matter outside the pleadings." *See* Md. Rule 2–322(c). Due to the fact that Mr. Resh never filed an answer, or an amended answer, setting forth release as a defense, the trial court should not have allowed him to rely upon that defense as a ground for the grant of the motion for summary judgment. *See Gilbert v. Washington Suburban Sanitary Comm'n,* 304 Md. 658, 661, 500 A.2d 1039 (1985); *Liberty Mut. v. Ben Lewis,* 121 Md.App. at 480–81, 710 A.2d 338; *Gooch v. Maryland Mech.,* 81 Md.App. at 386–88, 567 A.2d 954.

## VII.

▮ The trial judge, in his instructions to the jury as to the issue of contributory negligence, said:

The . . . plaintiffs cannot recover if their negligence is the cause of injury . . . . The Defendant has the burden of prov-

ing by a preponderance of the evidence that the Plaintiffs' negligence was a cause of the Plaintiffs' injury.

Also, in instructing the jury in regard to alleged violations by Mr. Bowser of various sections of the Transportation Article, the trial judge said in his instructions, "The violation of a statute, which is the cause of Plaintiffs' injury or damage, is evidence of negligence." In this appeal, Mr. Bowser argues as follows:

> The lower court erred when it instructed the jury that a finding of contributory negligence would operate to bar Resh's recovery, thereby inviting reference to injuries contrary to its *in limine* ruling, and when it referred to injuries while instructing the jury.

According to Mr. Bowser, these instructions "invited Resh to deviate from the *in limine* ruling by arguing to the jury, as they did, that attributing [Mr. Resh's] negligence to Josephine I. Resh and Elmer H. Dillsworth, whether on the basis of imputed negligence or agency, would prevent their recovery." Mr. Bowser's argument continues:

> [The Reshes' counsel's argument] constituted an indirect, but clear reference to the existence of underlying injuries and damages and only could have prejudiced the jury in favor of Resh on the issues of imputed negligence and agency, thereby unfairly minimizing the prospect that the jury would attribute [Mr. Resh's] negligence to anyone.

Appellant goes on to argue that proof of this last point was "evidenced by the fact that the jury found that [Mr. Resh] was negligent and that his negligence was a cause of the [a]ccident, but in spite of overwhelming evidence of imputed negligence and agency, found against Bowser on all of these issues."

Mr. Bowser's attorney objected to the judge's use of the word "injuries" in his instruction. In doing so, counsel characterized the court's use of the word as "inadvertent." But, appellant's counsel thereafter made no objections to any portion of the closing argument made by appellees' counsel.

■ We fail to see how Mr. Bowser was in any way prejudiced by the trial judge's inadvertent use of the word "injuries." This is important because in order for an appellant in a civil case to succeed on appeal, the appellant must show not only error but prejudicial error. *See Bradley v. Hazard Tech. Co., Inc.*, 340 Md. 202, 206, 665 A.2d 1050 (1995).

The jury was instructed during the trial that the only issue it had to determine was liability, and the special verdict sheet, filled out by the jury foreman, did not even mention contributory negligence. The only question relevant to "contributory negligence" was Question No. 2, where the jury was asked: "Do you find that Francis Resh was negligent and that his negligence was a cause of the accident on November 11, 1999?" The jury answered yes to that question, which barred the Reshes from making a recovery for loss of consortium. Appellant did not object to the wording of the verdict sheet.

Because appellant has failed to show prejudice, we hold that the trial judge did not commit reversible error by inadvertently referring to injuries in his jury instructions.

## VIII.

Appellant's last contention is that the trial court erred when it denied his motion for judgment notwithstanding the verdict and/or for new trial. According to appellant, the trial court "should have granted Bowser's motion for judgment notwithstanding the verdict for all of the same reasons the lower court should have granted Bowser's motion for judgment at the close of the Plaintiff's evidence and at the close of all the evidence."

A motion for judgment notwithstanding the verdict can only be granted on the grounds advanced in support of a motion for judgment made at the close of all the evidence. *See* Md. Rule 2–532(a). All the reasons Mr. Bowser's counsel gave at the close of the evidence for the grant of judgment have been discussed, *supra,* in Part II where we discussed the first issue presented. Our holding that the trial court did not err in denying appellant's partial motion for judgment on the issues

of agency and imputed negligence are dispositive of appellant's claim that the trial judge should have granted the post trial motion for judgment notwithstanding the verdict.

Appellant also asserts that the motion for new trial should have been granted "for the reasons stated herein." The reasons set forth by appellant have all been discussed *supra*. We hold that no reason set forth in appellant's brief required that a new trial be granted.

**JUDGMENT GRANTING THE MOTION TO DISMISS MR. BOWSER'S COUNTERCLAIM FOR CONTRIBUTION AGAINST FRANCIS RESH REVERSED;**

**ALL OTHER JUDGMENTS AFFIRMED; COSTS TO BE PAID EIGHTY PERCENT BY CARLTON BOWSER AND TWENTY PERCENT BY FRANCIS RESH.**